LISA A. TRAVIS, County Counsel
KRISTA C. WHITMAN, Assistant County Counsel
 [State Bar No. 135881]
LETICIA M. RAMIREZ, Deputy County Counsel
 [State Bar No. 289934]
COUNTY OF SACRAMENTO
700 H Street, Suite 2650
Sacramento, CA  95814
Telephone:  (916) 874-5813
Facsimile:  (916) 874-8207
E-mail:  whitmank@saccounty.net
File No.:  120257-000458

Attorneys for Defendants, County of Sacramento

## UNITED STATES COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SACRAMENTO HOMELESS UNION, a local of the CALIFORNIA HOMELESS UNION/STATEWIDE ORGANIZING COUNCIL, on behalf of itself and those it represents; BETTY RIOS; DONTA WILLIAMS; FALISHA SCOTT and all those similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF SACRAMENTO, a political subdivision of the State of California; CITY OF SACRAMENTO, a municipal corporation; and DOES 1-100, <br><br> Defendants. | Case No. 2:22-cv-01095-KJM-KJN <br><br> MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO EMERGENCY APPLICATION FOR MANDATORY INJUNCTION AND TEMPORARY RESTRAINING ORDER TO PREVENT LIFE-THREATENING HEAT-RELATED HARM TO MEMBERS OF THE SACRAMENTO HOMELESS COMMUNITY <br><br> Date:      July 8, 2022 <br> Time:      10:00 a.m. <br> Courtroom:  3 <br><br> US Chief District Judge Kimberly J. Mueller |

## I.    INTRODUCTION AND FACTUAL BACKGROUND

Plaintiffs Sacramento Homeless Union, Betty Rios, et al. allege that the County of Sacramento ("County") and City of Sacramento ("City") (collectively "Defendants") are failing to protect unsheltered residents from extreme heat by clearing homeless encampments and forcing occupants into more precarious or heat exposed locations, maintaining inadequate conditions at "Safeground" sites, opening an "insufficient" amount of cooling centers or air-conditioned locations, and failing to declare a local emergency related to weather conditions.

-1-

Based on these allegations, Plaintiffs assert five claims for relief: (i) State-Created Danger in Violation of Due Process Guaranteed by the Fourteenth Amendment to the United States Constitution under 42 U.S.C. § 1983 against all defendants; (ii) State-Created Danger in Violation of Due Process Guarantees under the California Constitution (Cal. Const. Art. I, §7) against all defendants; (iii) Violation of Article I, Section 1 of the California Constitution against all defendants; (iv) Violation of California Health and Safety Code Section 101025 (apparently a typographical error as the applicable statute is Section 101450) against the City; and (v) Violation of California Health and Safety Code Section 101405 (apparently a typographical error as the applicable statute is Section 101025) against the County.

Following the Court's denial of Plaintiffs' Request for Ex Parte Relief for a Temporary Restraining Order on the basis that Plaintiffs' filings did not demonstrate they face a particularized imminent injury, the Court set a hearing for the Motion for Preliminary Injunction for July 8, 2022.

The County opposes Plaintiffs' request for a mandatory preliminary injunction on the basis that the Plaintiffs' allegations are inaccurate and the County's actions to support the unsheltered during heat-related weather events are consistent with applicable laws.  First, the County is not conducting any sweeps or clearing of homeless encampments and is not currently operating any "Safeground" site or outdoor sanctioned encampment.  (Halcon Decl. ¶¶ 4-5.)

Second, the County has recently made available three cooling centers in the unincorporated County area to persons experiencing homelessness, in addition to the other public County facilities that are open to the public that provide respite from warm weather including, but not limited to, twelve public libraries and two community centers.  (Flynn-Nevins Decl. ¶ 8.) None of these facilities have reached maximum capacity despite the County publicizing the cooling centers via news media and social media channels, the availability of public transportation to these sites, and County outreach workers and other personnel who regularly visit homeless encampments or engage with the unsheltered population encouraging individuals to seek refuge from the heat.  (Dye Decl.¶ 7-9.)

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO EMERGENCY APPLICATION

Third, since the beginning of the COVID-19 pandemic and to present day, the County has partnered with a non-profit organization to distribute more than 2,800 gallons of water directly to encampments and unhoused persons in the unincorporated County area.  (Halcon Decl. ¶3.)

Fourth, the County's response to extreme weather is governed by the County's Emergency Operations Plan (Plan) adopted pursuant to state and federal regulations, including standards established by the National Weather Service and implemented by the County Office of Emergency Services (OES) and its Director (OES Director).  (Flynn-Nevins Decl. ¶¶5-6.) The implementation of the Plan includes, but is not limited to, the opening of cooling or warming centers, canvassing vulnerable populations such as homeless encampments to advise of resources, and conducting stakeholder calls to share information.  (Flynn-Nevins Decl. ¶6.) The Plan, including 2022 Extreme Heat Weather Annex, requires that the OES Director monitor heat-related conditions and coordinate with the Department of Human Assistance (DHA), Public Health Officer, and other stakeholders to determine what County efforts are needed to support persons experiencing homelessness during heat that exceeds typical weather conditions in Sacramento County.  (Flynn-Nevins Decl. ¶6.) It is DHA's practice to establish cooling centers in their facilities during Phase II weather events (which the County refers to as Significant Inclement Weather), rather than waiting for an Extreme Heat Warning under Phase III of the Plan.  (Flynn-Nevins Decl. ¶ 7.) As a result, DHA has activated cooling centers in their facilities twice in the month of June 2022 despite the fact that the temperatures never reached Phase III. DHA opens cooling centers in Phase II events, rather than waiting for the trigger of Phase III, because their population includes unhoused individuals who are more vulnerable to weather events.  (Dye Decl. ¶ 5.)  Phase III events affect the entire community. (Flynn-Nevins Decl. ¶ 6, 7.)

Fifth, the County's declaration of a local emergency or public health emergency is done in accordance with the California Emergency Services Act (codified as Government Code section 8550 et seq.) and the applicable provisions of the California Health and Safety Code. (Flynn-Nevins Decl. ¶ 5, 9.)  These state statutes establish the standard for declaring such

-3-

emergencies.  At this time, the conditions and circumstances necessary for declaring a local emergency or a public health emergency related to weather are not present.  (Flynn-Nevins Decl. ¶ 9.)

While Plaintiffs seek the Court's intervention to compel Defendants to, amongst other things, declare a local emergency pursuant to Government Code Section 8558(c) whenever temperatures reaching or exceeding 90 degrees Fahrenheit are forecasted and keep all designated cooling centers open on a 24-hour basis, Plaintiffs fail to articulate legal authority or produce sufficient evidence to warrant judicial action and merely articulate their belief that Defendants' policies and response to the heat's impact on the unsheltered population are inadequate.

The first seven pages of Plaintiffs' Ex Parte Emergency Application ("Application") consist of a string of conclusory and factually inaccurate assertions.  Only starting on page 8 do Plaintiffs begin to address how they might meet their burden of proof to either succeed on the merits or raise "serious questions" going to the merits of this case.  Plaintiffs have failed to show any likelihood of success on the merits of any of the claims as argued in their Application. Further, Plaintiffs have not met their burden of proof that they will suffer irreparable harm from denial for a mandatory injunction, that the balance of the equities tip in their favor, or that an injunction is in the public interest.  For these reasons, and those that follow, the County respectfully requests that Plaintiffs' motion for a mandatory preliminary injunction be denied.

## II.   LEGAL STANDARD FOR OBTAINING A PRELIMINARY INJUNCTION

Plaintiffs seeking a preliminary injunction must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in their favor, and that an injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).  Under the "sliding scale test", if a plaintiff raises "serious questions going to the merits," a court may grant interim relief if the balance of the hardships tips sharply in the plaintiff's favor, the plaintiff is likely to suffer irreparable harm, and the interim relief is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). A preliminary injunction is "an extraordinary remedy never awarded

-4-

1    as of right." *Benisek v. Lamone*, 138 S.Ct. 1942, 1943 (2018) (quoting *Winter*, 555 U.S. at 24).

2         Plaintiffs must prove all four factors are present and *likely* in order for this Court to grant

3    the extraordinary relief of a preliminary injunction. *Alliance*, 632 F.3d at 1134-35.  In this

4    instance, because Plaintiffs are seeking a mandatory injunction their burden is "doubly

5    demanding" and must "establish that the law and facts clearly favor [their] position, not simply

6    that [they are] likely to succeed." *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015). As

7    explained in *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*571 F.3d. 873, 879 (9th

8    Cir. 2009), a mandatory injunction goes well beyond simply maintaining the status quo--it orders

9    the responsible party to take action pending the determination of the case on its merits.  Here,

10   rather than maintain the status quo pendente lite, Plaintiffs seek to compel the County to open

11   more cooling centers, provide more cool water to unhoused persons and change the manner in

12   which the County declares a local emergency prior to the entry of a final judgment.  In general, a

13   mandatory preliminary injunction may not be granted "unless extreme or very dangerous damage

14   will result." *Id., see also, Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (citing, *Marlyn,*571

15   F.3d at 879.)

16        Plaintiffs cannot merely make a number of allegations that consist of nothing more than a

17   "formalistic recitation of the elements" of claims; such allegations are insufficient to meet the

18   standard for issuance of a mandatory preliminary injunction.  Generally, if a plaintiff fails to

19   show a likelihood of success, then the Court need not consider the other three elements because

20   it is a threshold issue. *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015) ("Because it is a

21   threshold inquiry, when 'a plaintiff has failed to show the likelihood of success on the merits, we

22   need not consider the remaining three *Winter* elements".) *Ass'n des Eleveurs de Canards et*

23   *d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (quoting *DISH Network Corp. v.*

24   *F.C.C.*, 653 F.3d 771, 776-77 (9th Cir. 2011)).  Moreover, Plaintiffs' burden is even greater and

25   more demanding because Plaintiffs seek a mandatory injunction, and thus they must establish

26   that the law and facts clearly favor their position, not simply they are likely to succeed. *Id.*

27   Plaintiffs have failed to show that unless a mandatory injunction issues, they will suffer extreme

28

or very serious damage.  The standard for issuing a mandatory preliminary injunction is high.  In general, mandatory injunctions are not issued in doubtful cases such as this.  *Id.; see also, Doe,* 28 F.4th at 111.

### III.  PLAINTIFFS FAIL TO SHOW LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS AND FAIL TO RAISE "SERIOUS QUESTIONS" GOING TO THE MERITS

#### A.  Plaintiffs Are Not Likely to Succeed on Their State-Created Danger Claim Under Federal and State Law (First, Second and Third Claims for Relief)

Plaintiffs' First, Second and Third Claims for Relief alleging that Defendants have subjected Plaintiffs to state-created danger in violation of the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. Section 1983, and Article I, Section 7 and Section 1 of the California Constitution are without merit.

The Ninth Circuit has recognized that state action can violate the guarantee of due process where the state or state officials act to place a person in a situation of known danger with deliberate indifference to their personal or physical safety.  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061-62 (9th Cir. 2006) (noting there can be a violation of due process "where the state action 'affirmatively place[s]the plaintiff in a position of danger,' that is, where stated action creates or exposes an individual to a danger which he or she would not have otherwise faced.").  The Supreme Court noted "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).  Further, the Ninth Circuit stated that "[in] examining whether an officer affirmatively places an individual in danger, we do not look solely to the agency of the individual, nor do we rest our opinion on what options may or may not have been available to the individual.  Instead, we examine whether the officer left the person in a situation that was more dangerous than the one in which they found him."  *Kennedy,* 439 F.3d at 1062 (citing *Munger v. City of Glasgow Police Dept.*, 227 F.3d 1082, 1086 (9th Cir. 2000)).

Here. Plaintiffs allege that by "'sweeping' existing homeless encampments where there is at least a modicum of protection from the extreme heat and thereby forcing those swept into the more dangerous circumstances of uncovered streets, sidewalks and triple-digit, unbearable hot 'Safeground' encampments, while failing to open a sufficient number of cooling centers and other safe, air-conditioned locations, Defendants have affirmatively placed and continue to place Plaintiffs in known or obvious danger." (Application, pp. 12-14).  However, the County has not engaged in any "sweeps" of existing homeless encampments or ordered the removal or clearing of homeless encampments in the unincorporated County.  (Halcon Decl. ¶ 5.).  The County does not operate any "Safeground" sites or any other outdoor sanctioned encampment in which residents inhabit tents.  (Halcon Decl. ¶ 4).  The declarations of Falisha Scott and Crystal Sanchez filed in support of Plaintiffs' Application state that the Safeground encampment located at Miller Park is operated by the City through its contractor First Steps Communities, and the sweeps are being conducted by the City, not the County.  (See Scott Decl. ¶1; Sanchez Decl. ¶¶ 6-8.)

The County has not failed to open a sufficient number of cooling centers and other safe, air-conditioned locations.  In fact, since June 21, 2022 the County has made available three cooling centers in the unincorporated County area to persons experiencing homelessness (one near the north part of the County, one near downtown, and one near the southern part of the County), during the hours of 2 p.m. or 4 p.m. through 8 p.m., depending on the location.  (Dye Decl. ¶ 3).  These three locations are offices of DHA, open to the public during the hours of 8 a.m. to 5 p.m., Monday through Friday.  One of the three centers is currently experiencing a major COVID outbreak among staff and one location is in outbreak status, which requires maintenance of social distancing, and the third location is quickly approaching outbreak status. (Dye Decl. ¶4.)

In order to maintain social distancing while still providing a cool place for unhoused individuals to gain respite, DHA opened its lobbies on the dates and times specified above. DHA is unable to open the lobbies earlier in the day as other members of the public are accessing

-7-

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO EMERGENCY APPLICATION

1  the buildings during those hours and is unable to assure the social distancing required during

2  COVID outbreaks.  However, should unhoused individuals arrive at a location prior to the stated

3  time, DHA management staff have the ability to let them in earlier if crowding would not result.

4  Pets are allowed at the cooling centers as long as they are leashed or crated. (Dye Decl. ¶ 4.)

5  In addition to these DHA locations, there are twelve public libraries and two community

6  centers in the County which unhoused individuals may use to provide respite from the heat, in

7  addition to the other public County facilities that are open to the public that provide respite from

8  warm weather.  (Flynn-Nevins Decl. ¶ 8).  None of these facilities have reached maximum

9  capacity despite the County publicizing the cooling centers via news media and social media

10  channels, the availability of public transportation to these locations via Sacramento Regional

11  Transit, and County outreach workers and other personnel who regularly visit homeless

12  encampments or engage with the unsheltered population encouraging individuals to seek refuge

13  from the heat.  (Dye Decl. ¶¶ 5-9).

14  Accordingly, Plaintiffs' allegations are merely conclusory statements not supported by

15  evidence.  There are simply no factual allegations that support Plaintiffs' argument that the

16  County actually placed any Plaintiff in a known or obvious danger.  Nor are there factual

17  allegations to support any claims that the County acted with deliberate indifference or placed any

18  unsheltered individual in a place of known danger.  Plaintiffs' state-created danger theories fail

19  because the County did not put Plaintiffs in a more dangerous situation then they have been in.

20  In the case of *Reed v. City of Emeryville*, 2021 U.S. Dist. LEXIS 206500 (N.D. Cal. Oct. 26,

21  2021) the Court found plaintiffs could not maintain a state-created danger theory under Section

22  1983 of the California Constitution because although a congregate shelter setting might have

23  exacerbated the plaintiffs' mental health impairments, had any of the plaintiffs accepted the

24  available shelter bed, did not mean that the City placed plaintiffs in a more dangerous situation

25  than living in an encampment next to an active construction site. See, e.g, *Young v. City of Los*

26  *Angeles*, 2020 U.S. Dist. LEXIS 23369 (C.D. Cal. Feb. 10, 2020) (dismissing claim where

27  despite allegation that plaintiff was forced to move from his encampment on numerous

28

-8-

occasions, plaintiff failed to allege that the City's actions "exposed Plaintiff to a danger which he would not have otherwise faced if he were not forced to move" and recognizing "general complaints that the City is not doing enough to assist his social needs . . . are not sufficient to state a substantive due process claim as there is no affirmative right to governmental aid."); *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 433 (N.D. Cal. 2017) (dismissing state-created danger/deliberate indifference claim where there were no "allegations of intentional eviction during precarious weather or other facts indicating deliberate indifference to the safety and welfare of the population" where plaintiffs were permitted to sleep in a City-owned lot or offered temporary emergency shelter); but see *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079 (E.D. Cal. 2012) (plaintiff stated a cognizable substantive due process claim where the plaintiff alleged that the defendants timed demolitions of the plaintiff's shelter and property to occur at the onset of the winter months and knew or should reasonably have known that their conduct threatened the plaintiff's continued survival). Here, the Plaintiffs argue that the alleged sweeps of homeless encampments and lack of "sufficient" cooling centers and other air-conditioned locations constitute a state-created danger. Yet they fail to acknowledge the challenging and dangerous conditions that exist in the allegedly cleared encampments. (See *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 433 (N.D. Cal. 2017) (finding that the clearing of an encampment by a city did not amount to "a deliberate indifference of placing Plaintiffs in an inherently more dangerous situation than they had faced previously.")

As stated above, the County has not engaged in any sweeps of existing homeless encampments or forced any homeless individuals into "more dangerous circumstances of uncovered streets, sidewalks and triple-digit" heat. Essentially, the County has not taken an affirmative action to create or expose Plaintiffs to a danger they would not have otherwise faced. (See generally, *Campbell v. State Dep't of Soc. & Health Servs.*, 671 F.3d 837, 847 [the state-created danger exception did not apply because (1) none of the defendants acted affirmatively to place the daughter in the way of a danger they had created, (2) her death was caused by the dangers inherent in her own physical and mental limitations, and (3) regarding bathing protocols

-9-

that had been removed, defendants' prior efforts to help keep her safe did not render them responsible for creating the danger to which she tragically Their acts were not affirmative acts akin to those found in cases where the court recognized a state-created danger).[1]

In fact, the County has proactively worked to open three cooling centers, in addition to the twelve public libraries and two community centers that are already open to the public and offer respite from the heat.  Together, there are already seventeen cooling centers already open in the unincorporated County in addition to those operated by the City.  In addition, the County continues to fund the delivery of water to homeless encampments and send outreach staff to encampments to encourage occupants to access services.  Accordingly, Plaintiffs' claims of violation of due process are without merit and Plaintiffs fail to show a likelihood of success on the merits on their First, Second and Third Claims for Relief and this factor tips in favor of the County.

The Plaintiffs' Fourth Claim for Relief is against only the Defendant City and is not addressed here.

.   **B. Plaintiffs Are Not Likely to Succeed on Their California Health and Safety Code Section 101450 Claim (Fifth Claim for Relief)**

Plaintiffs' Fifth Claim for Relief alleges that the County violated California Health and Safety Code Section 101405.  Section 101405 sets forth the powers and duties of the county health officer under contract and provides the following: "Whenever a contract has been duly entered into, the county health officer and his or her deputies shall exercise the same powers and duties in the city as are conferred upon city health officers by law."  However, Plaintiffs

---

[1] *See also Kennedy v. Ridgefield City*, 439 F.3d 1055, 1062 (9th Cir. (2006)(police confronting a man accused of child abuse by his neighbors without first warning the neighbors, as he had promised to do, after which the alleged child abuser killed two of the accusing neighbors); *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000)(police officer ejecting an obviously drunk man from a bar and leaving him outside on a bitterly cold night during which he froze to death); *Penilla by & Through Pnilla v. City of Huntington Park*115 F.3d 707, 707 (9th Cir. 1997) (police officers finding a man in need of serious medical attention, cancelling the man's request for the paramedics, and then locking him in his house, where he died); *L.W. Grubbs*, 974 F.2d 119,119 (9th Cir. 1992)(state hospital supervisor assigning nurse to work alone with a known, violent sex-offender who raped her); *Wood v. Ostrander*, 879 F.2d 583 (police leaving a woman alone at night in a known high crime area where she was subsequently raped)].

-10-

recitation of Section 101405 on Page 15 of the Application differs from the statute and in fact, is partly quoting Section 101025 of the Health and Safety Code.  Section 101025 is titled "Protection of public health in unincorporated territory" and reads as follows:

> The board of supervisors of each county shall take measures as may be necessary to preserve and protect the public health in the unincorporated territory of the county, including, if indicated, the adoption of ordinances, regulations and orders not in conflict with general laws, and provide for the payment of all expenses incurred in enforcing them.

The County construes Plaintiffs' reference to Section 101405 in their Fifth Claim for Relief to be an error and interprets this claim as alleging that the County is violating Section 101025 due to the County "opening only three cooling centers…and by otherwise failing to declare a local emergency despite the existence of 'extreme peril to the safety of persons,' the criteria for a declaration of local emergency under Government Code Section 8558(c) …" (Application pp. 15.)  Plaintiffs once again fail to offer any support, either legal or factual, that raises a serious question that the County violated Section 101025 or that its actions are inconsistent with Government Code Section 8558(c), a provision of the California Emergency Services Act.

The County has taken measures necessary to preserve and protect the public health of those within the unincorporated County area in accordance with state laws governing local emergencies and the protection of public health.  On June 15, 2022, the County Office of Emergency Services ("OES") adopted the "2022 Extreme Heat and Cold/Freeze Hazard Annexes." (Flynn-Nevins Decl. ¶ 4.)  The County's decisions about when to open cooling centers in response to heat are rooted in the science provided by the National Weather Service ("NWS").  The County's establishes a lower threshold, albeit consistent with the NWS, than the California Governor's Office of Emergency Services Extreme Temperature Response Plan for activating a response to weather events and making resources available to the public. (Flynn-Nevins Decl. ¶ 5.)  The Governor's Plan requires NWS Warnings for three or more consecutive days, while the County's plan only requires the issuance of a warning product by the NWS and could be a single day. (Flynn-Nevins Decl. ¶ 5.)  The NWS provides an hourly forecast that

-11-

1    indicates the hottest periods of the day are between 2:00 PM and 8:00 PM. (Flynn-Nevins Decl.

2    ¶8.) During any weather advisory, OES's responsibilities are to provide coordination of

3    information and resources among stakeholders. (Flynn-Nevins Decl. ¶ 6.). This includes

4    consulting with and coordinating with the County's Public Health Officer and DHA during

5    weather-related events in accordance with the County's Plan. (Flynn-Nevins Decl. ¶ 6.)

6         OES is responsible for managing responses to a weather emergency based on the

7    issuance of an Excessive Heat Warning by the NWS Sacramento which constitutes Phase III in

8    the Extreme Heat Hazard Annex. So far this summer, there have been no Phase III Excessive

9    Heat Warnings. (Flynn-Nevins Decl. ¶ 6.) For cooler events, Phase II in the Extreme Heat

10   Hazard Annex, DHA determines whether or not they will utilize weather respite motel vouchers

11   or open their lobbies as cooling centers. DHA independently makes this determination because

12   of their role in serving vulnerable populations which includes persons experiencing

13   homelessness. (Flynn-Nevins Decl. ¶ 7.) DHA most recently activated cooling centers in the

14   lobbies of three of their facilities on June 21, 2022 following the NWS issuance of a Partner

15   email indicating moderate heat risk. OES coordinated stakeholder calls which included the

16   County's Public Health Office and DHA. Under Section 101040, the Public Health Officer is

17   authorized to take any preventative measure that may be necessary to protect and preserve the

18   public health from *any public health hazard* during any local emergency declared pursuant to

19   Government Code Section 8558. The County's Plan states that the Public Health Officer will

20   certify or declare the existence of a public health emergency during a weather emergency

21   declared pursuant to Phase III in the Extreme Heat Hazard and track medical emergencies and

22   deaths. For example, the recent weather conditions for the period June 21-28 did not warrant the

23   declaration of a public health emergency related to weather. (Flynn-Nevins Decl. ¶ 6.)

24        Plaintiffs also argue that the County has failed to protect unsheltered residents of the

25   County from the risk of exposure to extreme heat because a local emergency has not been

26   declared pursuant to Government Code Section 8558(c). This argument ignores the complexity

27   and purpose behind the Emergency Services Act and oversimplifies the criteria for declaring a

28

-12-

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO EMERGENCY APPLICATION

1  local emergency.

2  　　　　The purpose of the Emergency Services Act is to ensure an adequate response to

3  emergencies by establishing organizations with authority and functions to address emergencies,

4  facilitating mutual aid, and creating a framework for a coordinated response.  (Gov. Code section

5  8550.)  Section 8558 establishes the conditions or degrees of emergencies in the State of

6  California and subsection (c)(1) states in relevant part:

7  　　　　　　"Local emergency" means the duly proclaimed existence of conditions of
disaster or of extreme peril to the safety of persons and property within the
8  　　　　　　territorial limits of a county, city and county, or city, caused by conditions
such as air pollution, fire, flood, storm, epidemic, riot, drought,
9  　　　　　　cyberterrorism, sudden and severe energy shortage, deenergization event,
plant or animal infestation or disease, the Governor's warning of an
10  　　　　　　earthquake or volcanic prediction, or an earthquake, or other conditions,
other than conditions resulting from a labor controversy, *which are or are*
11  　　　　　　*likely to be beyond the control of the services, personnel, equipment, and*
*facilities of that political subdivision and require the combined forces of*
12  　　　　　　*other political subdivisions to combat,* …. (emphasis added)

13

14  Based on the plain language of Section 8558(c)(1) a local emergency may be proclaimed only if

15  conditions of disaster or extreme peril to the safety of persons or property exist, which are likely

16  to require combined forces of other political subdivisions to combat.  The County generally does

17  not require the assistance of other jurisdictions to address heat-related emergencies.  (Flynn-

18  Nevins Decl. ¶ 9.)

19  　　　　Based on these facts the County has taken appropriate measures necessary to preserve

20  and protect the public health with regard to heat-related events.  Thus, the Plaintiffs are unlikely

21  to prevail on the merits of this claim which further weighs this factor in favor of the County.

22  **IV.　　PLANTIFFS HAVE NOT DEMONSTRATED THEY WILL SUFFER**
**　　　　IRREPARABLE OR IMMINENT HARM**

23

24  　　　　Plaintiffs argue in a conclusory fashion that failure to issue the mandatory preliminary

25  injunctive relief it seeks will result in immediate threatened injury.  However, all Plaintiffs offer

26  in support of their argument is speculative injury, which even they recognize in paragraph 30 of

27  their Ex Parte Application is not sufficient.  In fact, all Plaintiffs demonstrate by way of

28

-13-

submission of the Declaration of Flojaunne Cofer, is that "the impact of exposure of unsheltered persons to extreme heat *may* include irreversible aggravation of underlying medical conditions, permanent damage to vital organs and even death."  As the Court held in *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 22, the mere possibility of irreparable harm is insufficient to warrant preliminary injunction.  Here, the threatened injury is speculative and Plaintiffs have not met this element required for mandatory preliminary injunction relief.

Plaintiffs are requesting a court order requiring the County to declare a local emergency and provide at least 20 cooling centers operating 24 hours, 7 days a week whenever temperatures of 90 degrees or greater are forecast.  Yet they provide no factual support that such measures would prevent irreparable harm – both the demand for 20 centers[2] and the 90-degree standard appear to be pulled out of thin air.  None of cooling centers operated by DHA have reached maximum capacity so there is no basis to claim that failing to open up additional cooling centers will prevent any alleged harm.  (Dye Decl. ¶ 7.) Temperatures of 90 degrees are the norm for Sacramento summers and do not meet the conditions necessary to declare an emergency under the 2022 HeatRisk model. (Flynn-Nevins Decl. ¶ 9.) The absence of irreparable harm tips this factor in favor of the County.

## V.   PLAINTIFFS HAVE NOT MET THEIR BURDEN TO PROVE THE BALANCE OF INTERIM HARMS WEIGHS IN PLAINTIFFS' FAVOR AND THE PUBLIC INTEREST IS NOT SERVED BY GRANTING INJUNCTIVE RELIEF

Plaintiffs have failed to meet their burden to prove the balance of interim harms weigh in their favor, or that the public interest would be served by the granting of injunctive relief.  In fact, issuance of a mandatory preliminary injunction may undermine the public interest.  Judicial intervention in County policies established pursuant to state laws and regulations could potentially have the effect of changing the emergency plans for not only the Sacramento region, but could affect the entire state.  Furthermore, while "courts have flexible and expansive power to issue equitable relief, they do not have the power to disregard or set aside express terms of

---

[2] As stated above, the County already has 17 public facilities available to the public as respite from the heat.

-14-

1  legislation." *People ex rel. Dep't of Transp. v. Maldonado* (2001) 86 Cal.App.4th 1225, 1234

2  (citing *Armstrong v. Picquelle* (1984) 157 Cal. App. 3d 122, 129). The public interest would not

3  be served by supplanting the County Board of Supervisors' determinations regarding heat-related

4  emergencies and the deployment of resources in response to or establishing a standard different

5  than state law for what constitutes a local emergency or creating a new weather threshold to

6  govern the deployment of County resources.  Most agencies still use the Heat Index of 105/75

7  degrees for three days as the basis for heat, although the state's plan encourages them to switch

8  to the HeatRisk model.  (Flynn-Nevins Decl.) The County chose the HeatRisk model, and a

9  determination by the NWS Sacramento of an Excessive Heat Warning (which has national

10  standards for its issuance), to determine if the County is required to open cooling centers and a

11  weather emergency exists. (Flynn-Nevins Decl. ¶4.)  While Plaintiffs clearly disagree with the

12  County's policies and response to extreme heat, the County's efforts are consistent with state law

13  and are a valid exercise of their policymaking discretion. (*See Miralle v. City of Oakland* , 2018

14  U.S.Dist. LEXIS 201778 (N.D. Cal. Nov. 28, 2018), at *10; (holding that "the Court cannot

15  conclude that the public interest weighs conclusively in favor of enjoining the City from

16  exercising its considered judgment as to how to best maintain public health and safety.")  As

17  demonstrated, the issuance of a preliminary injunction is not in the public interest.

18  **IX.  CONCLUSION**

19  For all of the foregoing reasons, the County respectfully requests that the Court deny

20  Plaintiff's motion for a mandatory preliminary injunction.

21  DATED: July 1, 2022          LISA A. TRAVIS, County Counsel
                                 Sacramento County, California

24  By:   /s/ Krista C. Whitman
        Krista C. Whitman
        Assistant County Counsel

2360546