UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SACRAMENTO HOMELESS UNION, a local of the CALIFORNIA HOMELESS UNION/STATEWIDE ORGANIZING COUNCIL, on behalf of itself and those it represents; BETTY RIOS; DONTA WILLIAMS; FALISHA SCOTT and all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SACRAMENTO, a political subdivision of the State of California; CITY OF SACRAMENTO, a municipal corporation; and DOES 1–100,<br><br>Defendants. | No. 2:22-cv-01095-TLN-KJN<br><br>**ORDER** |

This matter is before the Court on Plaintiffs Sacramento Homeless Union (the "Union"), Betty Rios ("Rios"), Donta Williams, and Falisha Scott's ("Scott") (collectively, "Plaintiffs") Motion for Preliminary Injunction. (ECF No. 2.) Defendants County of Sacramento (the "County") and City of Sacramento (the "City") (collectively, "Defendants") have filed oppositions. (ECF Nos. 6, 19.) Plaintiffs have filed replies. (ECF Nos. 11, 20.) For the reasons set forth below, Plaintiffs' motion is GRANTED in part and DENIED in part.

///

///

## I.   FACTUAL AND PROCEDURAL BACKGROUND[1]

The instant case arises from Defendants' alleged failure to discharge their duties during Sacramento's triple-digit heat wave to protect the unhoused, one of society's most vulnerable populations. (*See* ECF No. 1.)  The first day of summer, Tuesday, June 21, 2022, brought triple-digit heat to the City and County of Sacramento and more triple-digit temperatures are forecasted in the summer ahead. (*Id.* at 1–2.)  Exposure to extreme heat has a disproportionate and frequently deadly impact on the unhoused. (*Id.* at 2.)  The majority of the visibly unhoused reside in encampments shaded by freeway overpasses, trees, and vegetation, and these encampments include makeshift habitations with covers that offer some defense against extreme heat. (*Id.*)

The City's official estimate of its unhoused residents is 3,900. (*Id.* at 1.)  Plaintiffs allege the City's code enforcement officials and members of the police department's "Impact Team" continue to destroy dozens of existing encampments while providing no alternative shelter. (*Id.* at 2.)  Plaintiffs therefore allege the City's eviction of the unhoused from these locations onto the unprotected streets and sidewalks or into sweltering tents atop heat-absorbing asphalt surfaces at "Safeground" parking lots is affirmatively increasing the risk of harm to the unhoused. (*Id.*)  At the Miller Park "Safeground" encampment — established by the City last year — temperatures inside tents placed on an asphalt parking lot approached 120 degrees Fahrenheit and residents went for hours without water or food. (*Id.*)  Plaintiffs allege the County announced the provision of only three cooling centers, none of which would be open and available to the unhoused until 4:00 pm, hours after the hottest time of the day. (*Id.*)

Plaintiffs allege that as the first day of the summer came to an end and reports were received by the Union of widespread heat-related suffering, Plaintiffs' counsel provided Defendants with a set of measures the Union believes necessary to protect the unhoused and which the Union believes Defendants are already under a statutory and constitutional duty to enact. (*Id.* at 3.)  On June 22, 2022, the County replied to Plaintiffs and defended its decision not to declare a local emergency by claiming that "[a]ccording to the National Weather Service, the

---

[1]     The instant factual and procedural background is taken, sometimes verbatim, from Plaintiffs' Complaint. (ECF No. 1.)

1   type of heat the County is experiencing is moderate and can be considered to be normal climate

2   conditions that occur seasonally." (*Id.*) Plaintiffs allege that on the same day at 2:08 pm, the

3   National Weather Service in Sacramento issued an "Urgent Weather Message" with a "Heat

4   Advisory" for the entire Sacramento Valley that warned of "[h]ot temperatures with highs 100 to

5   108 in the Valley" and a "locally high heat risk." (*Id.*) The City replied with a list of four cooling

6   centers, one of which was a City-established center with a maximum capacity of 50 and three of

7   which were unavailable until 4:00 pm. (*Id.*) Plaintiffs allege the City has otherwise failed to

8   address their concerns and has failed to dispute it was destroying encampments and otherwise

9   increasing the risk of unprotected exposure to the extreme temperatures. (*Id.* at 3–4.) Plaintiffs

10   contend extreme heat events are almost sure to recur over the course of the summer and the

11   population most vulnerable to high temperatures is the unhoused, who are frequently chronically

12   dehydrated and have no respite from the heat. (*Id.* at 4.)

13         Plaintiffs filed this case on June 24, 2022. (ECF No. 1.) Plaintiffs filed the instant motion

14   seeking injunctive relief on the same day. (ECF No. 2.) The case was reassigned to this Court on

15   July 15, 2022.[2] (ECF No. 16.) The Court noted that in light of the fact that the City was recently

16   served, it provided the City with adequate opportunity to respond to the instant motion by July 20,

17   2022, and Plaintiffs with an opportunity to reply to the City's response by July 25, 2022. (ECF

18   No. 17.)

19         **II.**    **STANDARD OF LAW**

20         Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear

21   showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555

22   U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "The

23   purpose of a preliminary injunction is merely to preserve the relative positions of the parties until

24   a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also*

25   *Costa Mesa City Emps. Ass'n v. City of Costa Mesa*, 209 Cal. App. 4th 298, 305 (2012) ("The

26   purpose of such an order is to preserve the status quo until a final determination following a

27

28     [2]    This case was initially assigned to U.S. District Judge Kimberly J. Mueller who recused herself under 28 U.S.C. § 455(a). (ECF No. 15.)

trial."); *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy.").

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  A plaintiff must "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  In evaluating a plaintiff's motion for preliminary injunction, a district court may weigh the plaintiff's showings on the *Winter* elements using a sliding-scale approach.  *Id.*  A stronger showing on the balance of the hardships may support issuing a preliminary injunction even where the plaintiff shows that there are "serious questions on the merits . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.*  Simply put, plaintiffs must demonstrate, "that [if] serious questions going to the merits were raised [then] the balance of hardships [must] tip[ ] sharply" in [p]laintiffs' favor in order to succeed in a request for preliminary injunction.  *Id.* at 1134–35.

"A preliminary injunction can take two forms.  A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits.  A mandatory injunction orders a responsible party to take action." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.* (*Marlyn*), 571 F.3d 873, 878–79 (9th Cir. 2009) (internal quotation marks and citations omitted); *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).  Plaintiffs seek a mandatory injunction.  (*See* ECF No. 2.)

"A mandatory injunction goes well beyond simply maintaining the status quo . . . [and] is particularly disfavored."  *Marlyn*, 571 F.3d at 879 (citation and internal quotation marks omitted).  A district court should deny a mandatory injunction, "unless the facts and law clearly favor the moving party."  *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust* (*Park Vill.*), 636 F.3d 1150, 1161 (9th Cir. 2001).  "In general, mandatory injunctions are not granted unless extreme or very serious damage will result[,] and are not issued in doubtful cases or where the

injury complained of is capable of compensation in damages." *Marlyn*, 571 F.3d at 879 (internal

quotation marks and citations omitted); *Garcia*, 786 F.3d at 740.

## III.   ANALYSIS

Plaintiffs move the Court for a mandatory injunction requiring Defendants to:

> (a) Declare a local emergency pursuant to California Government Code § 8558(c) whenever temperatures reaching or exceeding 90 degrees Fahrenheit are forecasted[;] (b) During said local emergencies, keep all designated cooling centers open on a 24-hour basis and increase the number of cooling centers to a total of at least 20 located close to significant concentrations of unhoused persons and of sufficient maximum capacity such that nobody is turned away for lack of space[;] (c) During said local emergencies, assign[] County and/or City personnel as needed, to go to all locations where [unhoused] persons are found and, using public address equipment and other means of mass communication, inform unhoused persons where they should gather in order to be provided transportation to an appropriate cooling center[;] (d) While canvassing areas where un[housed] persons are found, provide cold, potable water to those who request it, in sufficient quantities to insure that they are fully hydrated for the duration of the local emergency[; and] (e) Provide three nutritional meals per day, potable water, and cold-storage facilities at all "Safeground" sites to insure on days where the temperature is forecasted to be 90 degrees Fahrenheit or more, all residents are fully hydrated.

(ECF No. 2 at 15–16.)  Plaintiffs also seek a prohibitory injunction "prohibiting the clearing

of . . . encampments unless and until all those impacted by such actions are provided with non-

congregant, accessible, safe, indoor accommodations pursuant to *Martin v. Boise*."  (*Id.* at 16

(citing *Martin v. Boise*, 920 F.3d 584 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 674 (Dec. 16,

2019)).)  The Court finds that Plaintiffs sufficiently establish immediate and irreparable harm in

the absence of injunctive relief, the balance of equities tip in their favor, an injunction is in the

public interest, and with respect to the prohibitory injunction only is there is a likelihood of

success on the merits.  *See Winter*, 555 U.S. at 20.  The Court will address each of these *Winter*

prongs in turn.

### A.   Whether the Facts and Law Clearly Favor Plaintiffs and Likelihood of Success on the Merits

The Court will address whether the facts and law clearly favor Plaintiffs when evaluating

their request for a mandatory injunction and will address whether there is a likelihood of success

on the merits when evaluating their request for a prohibitory injunction.  *See Park Vill.*, 636 F.3d at 1161; *Winter*, 555 U.S. at 20.  The Court will consider each of Plaintiffs' claims in turn.

i.        *Claim One*

Plaintiffs allege Defendants have subjected them to state-created danger in violation of the Fourteenth Amendment of the Constitution by clearing or "sweeping" existing encampments and failing to open a sufficient number of cooling centers and other safe, air-conditioned locations. (ECF No. 1 at 12.)  Plaintiffs do not develop an argument as to this claim in the instant motion other than to state that they raise "serious questions" as to "whether by breaking up encampments where a modicum of protection from the heat exists and placing persons in a 'Safeground' camp where internal tent temperatures near 120 degrees[,] Defendants affirmatively increased the risk of harm in violation of the [Fourteenth] Amendment right to bodily integrity."[3]  (ECF No. 2 at 8– 9.)  The Court will first address the claim as asserted against the County and then address the claim as asserted against the City.

a)  <u>As Asserted Against the County</u>

In opposition, the County asserts: (1) it has not conducted any sweeps or ordered the removal or clearing of encampments in the unincorporated County, nor is it operating any Safeground site or outdoor sanctioned encampments; (2) it has made available three cooling centers[4] in the unincorporated County area to unhoused individuals, in addition to other public County facilities, including twelve public libraries and two community centers; and (3) it has partnered with a non-profit organization to distribute more than 2,800 gallons of water directly to encampments and unhoused individuals in the unincorporated County area.  (ECF No. 6 at 2–3, 7–8.)  The County maintains none of these facilities have reached maximum capacity despite the

---

[3]     Plaintiffs state "risk of harm in violation of the [Fourteenth] Amendment right to bodily integrity" here, but their claims as asserted in the Complaint are state-created danger in violation of the Fourteenth Amendment and California Constitution.  (*See* ECF No. 2 at 9; ECF No. 1 at 12–14.)  The Court will therefore only evaluate Plaintiffs' state-created danger claims.

[4]     The County states these cooling centers are the offices of the Department of Human Assistance ("DHA")) and are available for the unhoused from 2 pm or 4 pm through 8 pm.  (ECF No. 6 at 7.)

fact that they are publicized via news media and social media, they are accessible via Sacramento Regional Transit, and County personnel have visited encampments and encouraged individuals to seek refuge from the heat.  (*Id.* at 8.)  The County finally notes that Plaintiffs do not allege sufficient facts that it actually placed any Plaintiff in a known or obvious danger, or that it acted with deliberate indifference.  (*Id.*)

In reply, Plaintiffs assert that the County's declarations admit and the County concedes in its opposition that "not a single cooling center was available until well after the hottest time of the day." (ECF No. 11 at 3.)  Plaintiffs contend that publicity in existing media regarding cooling center availability is largely unavailable to unhoused individuals, and providing an announcement over social media "means nothing if someone [does not] have a charged cell phone from which to make a call for transportation."  (*Id.*)  Plaintiffs maintain requiring an individual to walk miles carrying everything they own in the heat "to get to a cooling center with severely limited hours without additional risk to their safety and health from such extreme exertion would actually constitute a state-created danger."  (*Id.*)  Plaintiffs note the County "shrugs off any responsibility" for the Safeground tent encampment since it is City-operated, but Safeground residents will suffer if the County fails to open a sufficient number of cooling centers and "make a real effort to provide on-the-ground awareness of their location and asserted availability of transportation." (*Id.* at 3–4.)  Finally, with respect to water distribution, Plaintiffs argue "[2,800] gallons of water did not come close to the medical threshold for hydration for 5,500 officially designated unhoused persons, let alone the 9,700 un[housed] recorded by the latest point in time survey." (*Id.* at 4.)

There is no fundamental right to housing.  *Lindsey v. Normet*, 405 U.S. 56, 92 (1972). However, the Ninth Circuit recognizes liability under substantive due process where a state or local official acts to place a person in a situation of known danger with deliberate indifference to their personal and physical safety.  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006).

> In examining whether an officer affirmatively places an individual in danger, [a court does] not look solely to the agency of the individual, nor [should it rest its] opinion on what options may or may not have

been available to the individual.  Instead, [the court] must examine whether the officer left the person in a situation that was more dangerous than the one in which they found him.

*Id.*  In order to prevail under a state-created danger theory, a plaintiff must show (1) there was "affirmative conduct on the part of the state in placing the plaintiff in danger" and (2) the state acted with "deliberate indifference" to a "known or obvious danger."  *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) (citing *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000); *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).

With respect to clearing or sweeping encampments, Plaintiffs concede in their reply that the portion of their Complaint and motion regarding sweeps "is primarily directed at the City." (ECF No. 11 at 4.)  The Court will therefore not address this issue with respect to the County.

With respect to an insufficient number of cooling centers, Plaintiffs contend the supplemental declaration of Union President Crystal Sanchez ("Sanchez") states security at cooling centers (the DHA offices) "routinely chase[] away anyone who does not have official business at these locations."  (ECF No. 11 at 3 (citing ECF No. 8).)  Plaintiffs contend that "[e]ven during the last month[']s extreme heat, the Union received reports and video recordings of security removing those who had come seeking shelter."  (*Id.*)  A review of both of Sanchez's declarations, however, reveal that Sanchez did not explicitly aver that County employees were chasing away or removing individuals who had come to cooling centers seeking respite from the heat.  (*See* ECF No. 2-1 at 5–13; *see also* ECF No. 8.)  Nor did Plaintiffs attach any of the aforementioned reports or video recordings to their Complaint or the instant motion.  (*See* ECF Nos. 1, 2.)  Nevertheless, with respect to these declarations and as to the remainder of Plaintiffs' allegations and arguments set forth above, it appears to the Court the crux of Plaintiffs' injury is due to the high temperatures in Sacramento, not any "*affirmative conduct*" by the County to place Plaintiffs in danger.  *See Patel*, 648 F.3d at 974 (emphasis added).

Plaintiffs do not cite to any case law in support of their proposition that insufficient access to cooling centers is a state-created danger in violation of the Fourteenth Amendment.  (*See* ECF No. 2.)  The County cites to *Kennedy*, in which Kimberly Kennedy contacted a police department

1   to report that a neighbor molested her young daughter.  439 F.3d at 1057.  Kennedy warned the

2   officer that the neighbor had "violent tendencies."  *Id.*  The officer "assured Kennedy she would

3   be given notice prior to any police contact with the [neighbor's family] about her allegations."  *Id.*

4   at 1058.  Despite this promise, the officer drove to the neighbor's residence and informed the

5   neighbor's family of the allegations prior to warning Kennedy.  *Id.*  Later that evening, the

6   suspect broke into Kennedy's house and shot Kennedy and her husband, killing the husband.  *Id.*

7   The Ninth Circuit found that, by notifying the neighbor's family of the allegations "before the

8   Kennedys had the opportunity to protect themselves from this violent response to the news," the

9   officer "affirmatively created an *actual, particularized* danger Kennedy would not otherwise have

10  faced."  *Id.* at 1063 (emphasis added).

11          Other Ninth Circuit opinions have permitted claims to proceed under the state-created

12  danger theory only where the state actor played a significant role in creating the dangerous

13  situation.  *See Munger*, 227 F.3d 1082 (holding police officers could be held liable for the death

14  of a visibly drunk patron from hypothermia they had ejected from a bar on an extremely cold

15  night); *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) (holding as viable a state-

16  created danger claim against police officers who, after finding a man in grave need of medical

17  care, cancelled a request for paramedics and locked him inside his house); *L.W.*, 974 F.2d 119

18  (holding state employees could be liable for the rape of a registered nurse assigned to work alone

19  with a known, violent sex-offender); *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989) (holding

20  state could be liable for the rape of a woman that an officer had left stranded in a known high-

21  crime area late at night).  In the instant case, the County's alleged action, or rather, failure to act,

22  falls far short of this standard.

23          Plaintiffs' primary allegation is that their Fourteenth Amendment rights are violated

24  through a state-created danger due to Defendants' *failure to open* a sufficient number of cooling

25  centers.  A failure to open a sufficient number of cooling centers, or, in essence, a failure to act, is

26  not "*affirmative* conduct" that puts Plaintiffs in danger.  *Patel*, 648 F.3d at 974 (emphasis added).

27  The Court remains sympathetic to the plight of the unhoused who are disproportionately affected

28  by the extreme heat.  However, Plaintiffs do not establish the County "affirmatively created an

9

1     actual, particularized" danger by failing to open a sufficient number of cooling centers.  Because

2     Plaintiffs cannot establish any "affirmative conduct" and Plaintiffs seek a mandatory injunction

3     with respect to the cooling centers (*see* ECF No. 2 at 16–17), the Court finds "the facts and law

4     [do not] clearly favor [Plaintiffs]."  *Park Vill.*, 636 F.3d at 1161.

5                         b)  <u>As Asserted Against the City</u>

6         In opposition, the City argues the Sacramento Police Department has not engaged in any

7     "sweeps" related to illegal camping anywhere in the City since 2018.  (ECF No. 19 at 5.)  The

8     City also argues Plaintiffs' claim that they were exposed to danger based on the inadequate

9     number of cooling/respite centers is without merit because the City recently opened or made

10    available to the public a number of libraries, spray parks, and public pools.  (*Id.*)

11        In reply, Plaintiffs maintain Sacramento police officers are in fact conducting sweeps, "in

12    some cases accompanied and in other cases unaccompanied by City code enforcement officers"

13    and "[t]he City continues to ticket, seize and tow vehicles which serve as residence and provide

14    protection, if limited, from extreme heat."[5]  (ECF No. 20 at 4.)  Plaintiffs contend the declaration

15    submitted by Sacramento Police Department Captain Bryce Heinlein ("Heinlein") conceals three

16    things: (1) the notice for camp residents to leave by a certain date and time constitutes the

17    beginning of and is an integral part of the sweep; (2) trying to distinguish that a sweep is

18    synonymous with "instantaneous removal," "without notification," and "outside a legal response"

19    is meaningless as even with a 72-hour notice, the unhoused have no place to go; and (3)

20    Heinlein's denial that the police or City conducts sweeps "cannot be reconciled with the City-

21    hired contractors who do the bulldozing and drive the garbage trucks into which the possessions

22    of the [unhoused] are routinely tossed."  (*Id.*)  Plaintiffs finally note the City leaves uncontested

23    Plaintiffs' allegations of deplorable conditions in its own City-operated Safeground at Miller Park

24    as set forth in Scott's declaration, and "the City has not even investigated, let alone remedied the

25    lack of water, food, sweltering temperatures in the tents or made any effort to publicize and offer

26    transportation to a cooling center."  (*Id.* at 7.)

27

28             ───────────────

[5]      Since Plaintiffs do not ask for injunctive relief with respect to vehicles specifically (*see* ECF No. 1 at 15–16), the Court declines to address any arguments with respect to vehicles.

As previously stated, in order to prevail under a state-created danger theory, a plaintiff must show (1) there was "affirmative conduct on the part of the state in placing the plaintiff in danger" and (2) the state acted with "deliberate indifference" to a "known or obvious danger." *Patel*, 648 F.3d at 974. The Court will address the clearing of encampments and the insufficient number of cooling centers in turn.

### 1. *Clearing of Encampments*

The limited evidence before the Court comes in the form of declarations. With respect to sweeps of encampments, Sanchez avers in a declaration dated June 23, 2022:

> Over the last year, we have collected close to 100 signed sworn declarations from members of the [unhoused] community attesting to the harm caused by sweeps and destruction of . . . encampments by the City . . . . The cumulative impact of these sweeps has been the dispersal of the [unhoused] such that they have been at increased risk of harm, separated from organized [unhoused] communities where they received donations of food, clothing, and materials with which to protect against extreme weather. Deprived of protective communities of other unhoused persons in areas once relatively shaded from sun and heat, by trees, other vegetation, freeway overpasses, tarps, etc. they are more endangered by extreme weather events. At the height of the pandemic, the Union obtained a writ of mandate from the Superior Court ordering the City of Sacramento to cease and desist from violating health orders and CDC guidelines as police destroyed one encampment after the other.[6] That writ has never been dissolved, yet City code enforcement and the police department's "Impact Team" have teamed up and resumed widespread clearing of . . . encampments. I have personally observed hundreds of . . . sweeps, including those carried out in hot weather. There is great physical effort expended by [unhoused] people who are already in poor health, generally, as they are forced to hurriedly pack their things and search for a new place to be. During the extreme heat of [the] last three days, I received dozens of reports from our officers and members regarding stress, extreme fatigue and collapse during sweeps.

(ECF No. 2-1 at 7.) Further, in Sanchez's declaration dated July 23, 2022, she states:

> The failure to provide accessible cooling enters is made worse by the continuing sweeps of the [unhoused] and clearing of encampments by the City and County through the Sacramento Police, [Department] of Utilities, Code enforcement and contractors such as "Forensiclean." These sweeps are cutting people off from access of water supplied by our Union and other community volunteers and

---

[6]     Plaintiffs provide a partial section of this writ of mandate with their reply, but do not provide it in its entirety. (*See* ECF No. 21-2 at 5.) The Court therefore declines to consider arguments with respect to this writ in the instant Order.

churches.  As the City admitted yesterday, all shelters are full . . . Tonight I was present when Union Pacific Railroad Police began clearing hundreds of us away from the railroad tracks.  California Highway Patrol officers distributed a handful of "Sacramento Homeless Resources" cards, attached hereto as Exhibit A.  There [is not] a single cooling center listed . . . As far as police sweeps are concerned, the Union has over the last two years canvassed dozens of camps and obtained over 125 statements sworn and signed under penalty of perjury showing that the Sacramento Police, Sacramento [Department] of Utilities, Code Enforcement and County sheriffs have continued to conduct sweeps despite being under a July[] 2020 Order for Writ of Mandate to refrain from removing [unhoused] persons or clearing encampments.

(ECF No. 21 at 2, 4.)  In Rios's declaration dated July 23, 2022, she further avers:

I have personally been swept dozens [of] times by Sacramento Police, City Code Enforcement, County Park Rangers and other law enforcement agencies, even after the [c]ourt issued a Writ of Mandate to stop the sweeps.  These sweeps are continuing even now during the extreme heat wave.  These sweeps have the effect of scattering hundreds of [unhoused] persons who were actually receiving things necessary to survive the heat wave such as food, coverings and especially water.  Members of the Homeless Union, Church, and community members who have been able to bring water to large numbers of people in one location cannot do that any longer because the sweeps by [Sacramento Police Department], City Code, Utilities [Department] enforcement and others have dispersed us all over town . . . Since 2019 when we made national news for a large sweep in which many of us lived on the proper prior [sic] to the old hotel and trailer park being torn down, we have been swept over 78 times.  We have lost over 30 encampment members due to weather related incidences after sweeps since 2019 . . . I currently live off of Morrison Creek.  We are swept on a regular basis, including during the hottest days, and not offered any real time services or transportation to any cooling centers . . . City code enforcement is using contractors such as "Forensiclean" and others using bulldozers, skiploaders, and garbag[e] trucks to destroy our possessions.  Sometimes they hand out 72-hour notices, but when there is nowhere to go, what good does that do us?  Other times they just show up, tell us to hurry up and pack and get out . . . I have medical conditions and so do many of the people in our encampments here in the Stockton [B]oulevard area.  I fear for my life and my family's life.  When they come and tag us and threaten us we literally panic, cry, stress out, and overexert ourselves just to protect what little stuff we have.  It feels like torture.  None of us want to be on the streets but we also [do not] want to be kettled into places that are more dangerous or in congregate settings . . . Generally three days after any sweep we see somebody die.  It breaks up our camps and people disperse wherever they can go[;] this often leads to people being preyed upon.

(*Id.* at 10–12.)  The Court has also reviewed the declarations of Mike Lopez dated July 23, 2022

1   (*id.* at 14–15), Joseph Stenman dated July 22, 2022 (*id.* at 17–18), Scott dated July 23, 2022 (*id.*

2   at 20–23), Elizabeth Mallard dated July 23, 2022 (*id.* at 25–26), and Lena Marino dated July 23,

3   2022 (*id.* at 27–29), most of which speak to the nature of these sweeps.

4          Conversely, Heinlein avers in a declaration dated July 20, 2022:

5          The Sacramento Police Department does not engage in "sweeps"
           relating to locations where illegal camping is taking place within the
6          City of Sacramento . . . Officers of the Sacramento Police
           Department have not engaged in activities characterized as a "sweep"
7          of a location where individuals are camping in violation of the City's
           camping ordinance since the decision of *Martin v. Boise* (2018) when
8          officers of the Sacramento Police Department became educated on
           this decision.  The City of Sacramento and the Sacramento Police
9          Department do not conduct "sweeps" which imply instantaneous
           removal of individuals and encampments without any notification
10         and outside a legal response.  For this reason, Department of Utilities
           and Citywide protocols have been created.

11

12  (ECF No. 19-2 at 1–2.)  The foregoing statement from Heinlein seems to imply the City could

13  continue to engage in sweeps of encampments *with* notification and *within* a legal response.  The

14  City has not provided any legally justified reason to clear or sweep encampments in its

15  opposition.  (*See* ECF No. 19.)

16         This Court has already held that a plaintiff's allegations regarding a defendant

17  municipality's efforts to confiscate and seize unhoused plaintiffs' shelters and possessions during

18  extreme weather were sufficient to establish the defendant could "knowingly place the

19  [unhoused] at increased risk of harm."  *Jeremiah v. Sutter Cnty.*, No. 2:18-cv-00522-TLN-KJN,

20  2018 WL 1367541, at *5 (E.D. Cal. Mar. 16, 2018).  Another court has concluded that plaintiffs

21  were unable to plead a state-created danger claim where "the generalized dangers of living on the

22  street" were not accompanied by "allegations of intentional eviction during precarious weather or

23  other facts indicating deliberate indifference to the safety and welfare of the population."  *Cobine*

24  *v. City of Eureka* (*Cobine I*), 250 F. Supp. 3d 423, 433 (N.D. Cal. 2017).

25         In the instant case, Plaintiffs' declarations detail heat-related mortality and morbidity

26  deaths and illnesses from heat exposure.  (*See* ECF Nos. 2-1, 2-2, 8, 21, 21-1.)  In light of the

27  "stress, extreme fatigue and collapse" accompanying these sweeps as detailed above, the Court

28  finds that the City's sweeping or clearing of encampments in extreme heat to be "affirmative

conduct" on the part of the City in placing Plaintiffs in danger.  *Patel*, 648 F.3d at 974.  Plaintiffs

also adequately establish through the above excerpt of Sanchez's declaration that the City acted

with "deliberate indifference" to the "known or obvious danger" of extreme heat.  *Id.*

Because Plaintiffs seek a prohibitory injunction with respect to clearing encampments, the

applicable standard is whether Plaintiffs are likely to succeed on the merits.  (ECF No. 2 at 16);

*see also Winter*, 555 U.S. at 20.  The Court finds, based on the foregoing, that Plaintiffs are likely

to succeed on the merits with respect to clearing encampments.

### 2.  Insufficient Cooling Centers

With respect to a lack of access to cooling centers, Sanchez avers in a declaration dated

June 23, 2022, that she has been to the City's Safeground site at Miller Park, "where tents are

placed directly on a burning hot asphalt parking lot" and she has "observed residents drenched in

sweat and in obvious physical stress as [] they emerge from their tents."  (ECF No. 2-1 at 7.)

Scott, a resident of the Safeground site at Miller Park, states in a declaration dated June 23, 2022:

> This encampment was set up by the City of Sacramento and is
> operated by First Step Communities, a contractor for the City.  I am
> one of about fifty [unhoused] persons who live in small tents pushed
> side by side on an asphalt parking lot . . . "Safeground" is completely
> surrounded by a metal fence that has four gates.  The gates are
> padlocked from the outside every night at midnight and remain
> locked until 5:00 am the next morning . . . [S]ince the current heat
> wave began, Camp management has said nothing and made no effort
> to check on us or help us even though the temperature inside the tents
> is now around 120 degrees.  Even at night the tents are unbearably
> hot because the asphalt parking lot on which our tents sit absorbs and
> retains heat [and] you can be burned by just touching it.  For the last
> few nights, I have awakened covered in sweat, the tent filled with
> puddles of sweat . . . Three weeks ago when the first heat wave came,
> we were provided with transportation to a cooling center and bus
> passes to return.  However, in the last three days, we have not been
> provided with any information about cooling centers or
> transportation or bus passes to get there . . . The Camp management
> does not check to see if we are [okay] in these hot tents.  A person
> could be suffering and even die from the heat and nobody would find
> out.  The heat is making it worse for those of us who suffer from
> psychiatric conditions, including me.  People are exhausted and have
> no energy.  This place is like a concentration camp.

(*Id.* at 2–3.)  Scott also notes the camp runs out of water quickly (there are only about six pints of

water for each person all day and night), the containers are not refilled more than two or three

times a day, and there are no coolers to keep the water cold so they "are forced to drink very hot

14

water as it stands out in the sun and heat." (*Id.*)  In a declaration dated July 23, 2022, Rios avers:

> During one of the sweeps I was moved into the City's "Safe[g]round"
> [sites] which was not safe at all[;] in fact it placed me in greater
> danger.  People were being trafficked out of the site.  We asked for
> basic needs such as water and oftentimes were given such limited
> amount it [was not] enough for all of us.  We were placed on hot
> asphalt underneath the freeway.  Eventually they moved people out
> of the X Street [Safeground] and placed them at Miller Park.  I have
> been to that location; during last week's heat wave the temperatures
> inside the "Safeground" tents was over 110 degrees as measured by
> Homeless Union officers using professional thermometers.  But in
> the last two heatwaves, they did not offer any transportation to
> cooling centers and have not increased the amount of water being
> provided.  People are suffering thirst and heat stress.

(ECF No. 21 at 10–11.)  The Court has also reviewed the declarations of Mike Lopez dated July 23, 2022 (*id.* at 14–15), Joseph Stenman dated July 22, 2022 (*id.* at 17–18), Scott dated July 23, 2022 (*id.* at 20–23), Elizabeth Mallard dated July 23, 2022 (*id.* at 25–26), and Lena Marino dated July 23, 2022 (*id.* at 27–29), all of which speak to insufficient access to cooling centers.

As stated previously, Plaintiffs' primary allegation is that their Fourteenth Amendment rights are violated through a state-created danger due to Defendants' *failure to open* a sufficient number of cooling centers.  A failure to open a sufficient number of cooling centers, or, in essence, a failure to act, is not "*affirmative* conduct" that puts Plaintiffs in danger.  *Patel*, 648 F.3d at 974 (emphasis added).  The Court finds the conditions of the City-run "Safeground" sites as described by Plaintiffs to be shocking, and it is distressing that the unhoused face such a terrible situation on days with extreme heat.  The fact remains, however, that Plaintiffs do not establish the City "affirmatively created an actual, particularized" danger by failing to open a sufficient number of cooling centers.

Because Plaintiffs seek a mandatory injunction with respect to a failure to open sufficient cooling centers, the applicable standard is to deny the injunction "unless the facts and law clearly favor the moving party."  (ECF No. 2 at 15–16); *see also Park Vill.*, 636 F.3d at 1161.  The Court finds, based on the foregoing, that "the facts and law [do not] clearly favor [Plaintiffs]" with respect to a failure to open a sufficient number of cooling centers.

///

///

1      *ii.      Claim Two against the City and County*

2           Plaintiffs allege Defendants have subjected them to state-created danger in violation of

3    Article I, § 7 of the California Constitution by "sweeping" existing encampments and failing to

4    open a sufficient number of cooling centers and other safe, air-conditioned locations.  (ECF No. 1

5    at 13.)  Plaintiffs do not address this specific provision of the California Constitution, nor do they

6    develop an argument as to this claim in the instant motion other than to state that they raise

7    "serious questions" as to "whether by breaking up encampments where a modicum of protection

8    from the heat exists and placing persons in a 'Safeground' camp where internal tent temperatures

9    near 120 degrees[,] Defendants affirmatively increased the risk of harm."  (ECF No. 2 at 8–9.)

10   Defendants' arguments in opposition with respect to this claim are the same as their arguments

11   for the first and third claims.  (*See* ECF No. 6 at 6–10; ECF No. 19 at 4–5.)

12           Article I, § 7(a) of the California Constitution states: "A person may not be deprived of

13   life, liberty, or property without due process of law."  The due process guarantee under the

14   California Constitution has been construed consistently with the due process guarantee under the

15   U.S. Constitution and in some cases extends broader protections.  *See Garfinkle v. Superior*

16   *Court*, 21 Cal. 3d 268, 281–82 (1978); *San Jose Police Officers Ass'n v. City of San Jose*, 199

17   Cal. App. 3d 1471, 1478–79 (1988) ("The difference between California and federal law stems

18   from *People v. Ramirez* . . . Under *Ramirez*, when a person is deprived of a statutorily conferred

19   benefit, due process analysis must start not with a judicial attempt to decide whether the statute

20   has created an entitlement that can be defined as liberty or property, but with an assessment of

21   what procedural protections are constitutionally required in light of the governmental and private

22   interests at stake.") (citing *People v. Ramirez*, 25 Cal. 3d 260, 263–64 (1979)) (internal quotation

23   marks omitted).  As these broader protections conferred by the California Constitution are not

24   applicable in the instant case because it does not involve a statutorily conferred benefit, the Court

25   concludes the second claim will have an identical outcome to the first claim.  Accordingly, with

26   respect to sweeps of encampments, Plaintiffs are likely to succeed on the merits, and with respect

27   to a failure to open a sufficient number of cooling centers, the facts and law do not clearly favor

28   Plaintiffs.

*iii.*          *Claim Three against the City and County*

Plaintiffs allege Defendants have violated Article I, § 1 of the California Constitution by "sweeping" existing encampments and failing to open a sufficient number of cooling centers and other safe, air-conditioned locations.  (ECF No. 1 at 13.)  Plaintiffs do not develop an argument as to this claim in the instant motion other than to state that they raise "serious questions" as to "whether by breaking up encampments where a modicum of protection from the heat exists and placing persons in a 'Safeground' camp where internal tent temperatures near 120 degrees[,] Defendants affirmatively increased the risk of harm in violation of . . . Article I, [§] 1 of the California Constitution which includes the pursuit and attainment of 'safety' among other rights described as 'inalienable.'"  (ECF No. 2 at 8–9.)  Defendants' arguments in opposition with respect to this claim are the same as their arguments for the first and second claims.  (*See* ECF No. 6 at 6–10; ECF No. 19 at 4–5.)

Article I, § 1 of the California Constitution states: "All people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

By repeating the same paragraph of allegations in this claim as Plaintiffs allege in their first and second claims, the Court finds Plaintiffs allege a state-created danger claim in violation of Article I, § 1 of the California Constitution.  (*See* ECF No. 1 at 12–14.)  This is how Defendants construe this claim in their oppositions, and Plaintiffs do not correct them in reply.  (*See* ECF Nos. 6, 11, 19, 20.)  Plaintiffs do not provide any authority to suggest that other courts have recognized a state-created danger claim under this section of the California Constitution, nor do they provide any authority at all other than mere citation to this specific provision of the California Constitution.  (*See* ECF Nos. 2, 11, 20.)  Accordingly, the Court finds Plaintiffs have provided insufficient authority for this claim.  Nevertheless, the relief Plaintiffs seek in this claim is identical to the relief sought in the first and second claims, where the Court has already found that with respect to sweeps of encampments, Plaintiffs are likely to succeed on the merits, and with respect to a failure to open a sufficient number of cooling centers, the facts and law do not

1  clearly favor Plaintiffs.

2  *iv.        Claim Four against the City*

3  Plaintiffs allege the City has violated California Health and Safety Code § 101025.  (ECF

4  No. 1 at 14.)  Plaintiffs do not develop an argument as to this claim in the instant motion other

5  than to state that they raise "serious questions" as to "whether by failing to do anything more than

6  open a token handful of cooling centers[,] Defendants disregarded an existing duty under

7  California[] Health and Safety Code [§] 101025 . . . instructing that cities and counties, 'shall take

8  measures necessary to preserve and protect the public health.'"  (ECF No. 2 at 9.)  In opposition,

9  the City states that Plaintiffs actually intended to refer to California Health and Safety Code §

10  101450 ("§ 101450"), which states the City "has the authority and discretion to decide what

11  'ordinances, regulations, and orders' are necessary to protect public health."[7]  (ECF No. 19 at 6.)

12  California Health and Safety Code § 101025 provides that "[t]he board of supervisors of

13  each county shall take measures as may be necessary to preserve and protect the public health in

14  the unincorporated territory of the county, including, if indicated, the adoption of ordinances,

15  regulations and orders not in conflict with general laws, and provide for the payment of all

16  expenses incurred in enforcing them."

17  First, the Court finds Plaintiffs cannot allege a California Health and Safety Code §

18  101025 claim against the City because it is not applicable to the City — that section specifically

19  applies to *the board of supervisors for each county*.  Second, even if Plaintiffs had alleged a claim

20  against the City under the correct section, Plaintiffs cite to no authority *at all* in their motion and

21  reply to indicate that the City in fact violated the section.

22  Because Plaintiffs seek a mandatory injunction requiring Defendants to "[d]eclare a local

23  emergency pursuant to [California Government] Code § 8558(c) whenever temperatures reaching

24

---

25  [7]        The City also argues that granting injunctive relief would constitute an unnecessary
judicial intrusion on the City's policymaking discretion authority under § 101450 and California

26  Government Code § 8558(c), and that it "has clearly taken extensive measures to provide access
to respite/cooling centers and other facilities to provide relief to all City residents that have been

27  impacted by recent increasing temperatures."  (ECF No. 19 at 6.)  Because the Court finds
Plaintiffs have alleged a claim under an inapplicable section, it declines to address these

28  arguments.

or exceeding 90 degrees Fahrenheit are forecasted," to keep all cooling centers open on a 24-hour basis and increase the number of cooling centers, to assign personnel to inform the unhoused about transportation to a cooling center, to provide cold, potable water, and to provide three nutritional meals per day, the applicable standard is to deny the injunction "unless the facts and law clearly favor the moving party."  (ECF No. 2 at 15–16); *see also Park Vill.*, 636 F.3d at 1161.  The Court finds, based on the foregoing, that "the facts and law [do not] clearly favor [Plaintiffs]."

*v.*        *Claim Five against the County*

Plaintiffs allege the County has violated California Health and Safety Code § 101405.  (ECF No. 1 at 15.)  As stated above, Plaintiffs do not develop an argument as to this claim in the instant motion other than to state that they raise "serious questions" as to "whether by failing to do anything more than open a token handful of cooling centers[,] Defendants disregarded an existing duty under California[] Health and Safety Code [§] 101025 . . . instructing that cities and counties, 'shall take measures necessary to preserve and protect the public health.'"  (ECF No. 2 at 9.)

In opposition, the County argues that Plaintiffs have alleged a claim under the wrong section, as California Health and Safety Code § 101405 "sets forth the powers and duties of the county health officer under contract."  (ECF No. 6 at 10.)  "The County construes Plaintiffs' reference to [§] 101405 . . . to be an error and interprets this claim as alleging that the County is violating [§] 101025."[8]  (*Id.* at 10–11.)

California Health and Safety Code § 101405 states that "[w]henever a contract has been duly entered into, the county health officer and his or her deputies shall exercise the same powers

---

[8]        The County also maintains "Plaintiffs once again fail to offer any support, either legal or factual, that raises a serious question that the County violated [§] 101025 or that its actions are inconsistent with Government Code [§] 8558(c)" and that it "has taken measures necessary to preserve and protect the public health of those within the unincorporated County area in accordance with state laws governing local emergencies and the protection of public health."  (ECF No. 6 at 10–13.)  Because the Court finds Plaintiffs have alleged a claim under an inapplicable section, it declines to address these arguments.

1  and duties in the city as are conferred upon city health officers by law."

2  The Court's conclusion here is the same as it is in the fourth claim. First, the Court finds

3  this section does not apply in the instant case as it deals with the power of the county health

4  officers and his or her deputies, and Plaintiffs do not provide any allegations in their Complaint

5  regarding these individuals. It appears that Plaintiffs have twice alleged claims using the

6  incorrect California Health and Safety Code sections. Second, even if Plaintiffs had alleged a

7  claim against the County under the correct section, Plaintiffs cite to no authority *at all* in their

8  motion and reply to indicate that the County in fact violated the section.

9  Because Plaintiffs seek a mandatory injunction requiring Defendants to "[d]eclare a local

10  emergency pursuant to [California Government] Code § 8558(c) whenever temperatures reaching

11  or exceeding 90 degrees Fahrenheit are forecasted," to keep all cooling centers open on a 24-hour

12  basis and increase the number of cooling centers, to assign personnel to inform the unhoused

13  about transportation to a cooling center, to provide cold, potable water, and to provide three

14  nutritional meals per day, the applicable standard is to deny the injunction "unless the facts and

15  law clearly favor the moving party." (ECF No. 2 at 15–16); *see also Park Vill.*, 636 F.3d at 1161.

16  The Court finds, based on the foregoing, that "the facts and law [do not] clearly favor

17  [Plaintiffs]."

18             **B.**     <u>Irreparable Harm</u>[9]

19  Plaintiffs argue the harm is both irreparable and imminent, as "the impact of exposure of

20  [unhoused] persons to extreme heat may include irreversible aggravation of underlying medical

21  conditions, permanent damage to vital organs and even death." (ECF No. 2 at 9–10.) In

22  opposition, the City does not address this issue. (*See* ECF No. 19.)

23  The Ninth Circuit has held that "an alleged constitutional infringement will often alone

24  constitute irreparable harm." *Associated Gen. Contractors of Cal., Inc. v. Coal. of Econ. Equity*,

25  950 F.2d 1401, 1412 (9th Cir. 1991). Plaintiffs have shown the likelihood of a constitutional

26  ───────────────

27  [9]    Because the Court finds that only Plaintiffs' first and second state-created danger claims against the City are likely to succeed on the merits, it will only address the City's arguments with respect to the remaining *Winter* elements — irreparable harm, balancing of equities, and public

28  interest.

1   violation, namely state-created danger in violation of their substantive due process rights by the

2   City's clearing of encampments.  In addition, Plaintiffs' declarations detail heat-related mortality

3   and morbidity deaths and illnesses from heat exposure (*see* ECF Nos. 2-1, 2-2, 8, 21, 21-1), and

4   the Court finds the harm Plaintiffs allege to be potentially severe.  Accordingly, the Court finds

5   that Plaintiffs have demonstrated that irreparable harm will result in the absence of injunctive

6   relief.

7                           C.      Balancing of Equities and Public Interest

8            Plaintiffs argue the City has itself indicated the public interest in protecting the unhoused

9   from extreme temperatures, citing to the City Council's Resolution No. 2020-0017, which states

10   that the unhoused "are at risk, theft, crime, and extreme weather conditions," which "result in a

11   threat to the public health and well-being of the community."  (ECF No. 2 at 11.)  Plaintiffs also

12   argue that whatever hardship to Defendants may arise, it "is far outweighed by the hardship to

13   those at risk of great bodily harm by unsheltered exposure to extreme temperatures."  (*Id.*)

14   Plaintiffs finally note the public "is served by measures that protect its most vulnerable members

15   from harm from extreme weather conditions" and "to the extent that the Court's intervention is

16   necessary to insure the most vulnerable members of the community are included, the issuing of an

17   injunction is very much in the public interest."  (*Id.*)  In opposition, the City does not address this

18   issue.  (*See* ECF No. 19.)

19            "The purpose of preliminary injunctive relief is to preserve the status quo if the balance of

20   equities so heavily favors the moving party that justice requires the court to intervene to secure

21   the positions until the merits of the action are ultimately determined."  *Heflebower v. U.S.*

22   *Bank Nat. Ass'n*, No. CV F 13–1121 LJO MJS, 2013 WL 3864214, at *18 (E.D. Cal. July 23,

23   2013) (citing *Univ. of Tex.*, 451 U.S. at 395).  A court balancing the equities will look to possible

24   harm that could befall either party.  *See CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d

25   1051, 1081 (E.D. Cal. 2009), *aff'd*, 348 F. App'x 288 (9th Cir. 2009).

26            Here, the Court notes the possible harm in temporarily restraining the City from clearing

27   encampments may hamper the City's ability to promote the public health, safety, and general

28   welfare.  However, the City's interest in clearing encampments during extreme heat events is far

1   outweighed by Plaintiffs' interest in their own health and welfare.  Furthermore, courts have

2   found there is a strong "public interest in maintaining the protection afforded by the constitution

3   to those most in need of such protections."  *Cobine v. City of Eureka* (*Cobine II*), No. C 16-02239

4   JSW, 2016 WL 1730084, at \*7 (N.D. Cal. May 2, 2016).  Plaintiffs are unhoused individuals,

5   who are persons "most in need of such protections."  Accordingly, the Court finds the balance of

6   equities tips in favor of Plaintiffs and the public interest is served by the issuance of an injunction.

7                    D.      Bond

8          Although the parties do not address this issue, the Court waives the discretionary bond

9   requirement set forth in Federal Rule of Civil Procedure 65(c).  *See Governing Council of*

10  *Pinoleville Indian Cmty. v. Mendocino Cnty.*, 684 F. Supp. 1042, 1047 (N.D. Cal. 1988)

11  (citing *People of California v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325–26 (9th Cir.

12  1985)) ("[C]ourts have discretion to excuse the bond requirement . . . .").  Plaintiffs are unhoused

13  individuals who are unable to afford adequate housing and to require bonds would place them in a

14  further position of hardship.

15         In sum, Plaintiffs have adequately "[made] a showing on all four prongs" of the *Winter*

16  test to obtain a preliminary injunction.  *All. for the Wild Rockies*, 632 F.3d at 1135.  Based on the

17  foregoing, the only injunctive relief Plaintiffs seek that the Court is inclined to grant is

18  "prohibiting the clearing of . . . encampments unless and until all those impacted by such actions

19  are provided with non-congregant, accessible, safe, indoor accommodations pursuant to *Martin v.*

20  *Boise*."  (ECF No. 2 at 16.)  The Ninth Circuit held in *Martin* that "the Eighth Amendment's

21  prohibition on cruel and unusual punishment bars a city from prosecuting people criminally for

22  sleeping outside on public property when those people have no home or other shelter to go to."

23  920 F.3d at 603.  In contrast, the crux of the relief Plaintiffs seek in this case is to stop the City

24  from clearing encampments because those encampments provide some amount of respite from the

25  extreme heat in Sacramento — *not* that Plaintiffs are being prosecuted criminally for sleeping

26  outside on public property.  A district court has the authority *sua sponte* to order or modify

27  injunctive relief.  *Armstrong v. Brown*, 768 F.3d 975, 980 (9th Cir. 2014) (citing *Clement v. Cal.*

28  *Dep't of Corrs.*, 364 F.3d 1148, 1150 (9th Cir. 2004); *Brown v. Plata*, 563 U.S. 493, 542–43

(2011)).  The Court finds *Martin* has no bearing on the injunctive relief that Plaintiffs seek.  Accordingly, the Court will modify the request for injunctive relief to exclude any reference to *Martin*.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction is GRANTED with respect to Plaintiffs' request to temporarily enjoin the City and all of its officers, agents, servants, employees, attorneys, and all persons under their direction and control, from clearing encampments belonging to the unhoused.  (ECF No. 2.)  In all other respects, Plaintiffs' Motion for Preliminary Injunction is DENIED.  (*Id.*)

District courts are entitled to take judicial notice of adjudicative facts *sua sponte*.  Fed. R. Evid. 201(c)(1).  The Court takes judicial notice of National Weather Service data, which state that the monthly highest maximum temperatures for the Sacramento area have historically occurred during the months of June, July, August, and September.  National Weather Service, *Climate*, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, https://www.weather.gov/wrh/Climate?wfo=sto (last visited July 28, 2022).  Accordingly, the preliminary injunction shall remain in effect for 28 days.  After the expiration of the preliminary injunction, Plaintiffs may once again seek to reinstate the preliminary injunction by filing a motion with this Court making a showing on all of the *Winter* prongs and providing greater detail about the weather forecast for the remainder of the summer months.

IT IS SO ORDERED.

DATED:  July 28, 2022

Troy L. Nunley
United States District Judge