UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SACRAMENTO HOMELESS UNION, a local of the CALIFORNIA HOMELESS UNION/STATEWIDE ORGANIZING COUNCIL, on behalf of itself and those it represents; BETTY RIOS; DONTA WILLIAMS; FALISHA SCOTT and all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SACRAMENTO, a political subdivision of the State of California; CITY OF SACRAMENTO, a municipal corporation; and DOES 1–100,<br><br>Defendants. | No. 2:22-cv-01095-TLN-KJN<br><br>**ORDER** |

This matter is before the Court on Plaintiffs Sacramento Homeless Union (the "Union"), Betty Rios ("Rios"), Donta Williams, and Falisha Scott's ("Scott") (collectively, "Plaintiffs") Motion to Extend or Reinstate the Preliminary Injunction and for Sanctions. (ECF No. 24.) Defendant City of Sacramento (the "City") filed an opposition.[1] (ECF No. 28.) Plaintiffs have filed a reply. (ECF No. 32.) For the reasons set forth below, Plaintiffs' Motion to Extend or

---

[1] Defendant County of Sacramento (the "County") is also a named Defendant in this action, but it has not submitted an opposition to the instant motion. The Court will refer to the City and County collectively as "Defendants" herein.

1

Reinstate the Preliminary Injunction is GRANTED and Plaintiffs' Motion for Sanctions is DENIED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Court need not detail the factual background of this case as it is set forth in full in the Court's July 29, 2022 Order. (*See* ECF No. 22.) In short, the instant case arises from Defendants' alleged failure to discharge their duties during Sacramento's triple-digit heat wave to protect the unhoused, one of society's most vulnerable populations. (*See* ECF No. 1.) Plaintiffs filed this case on June 24, 2022. (ECF No. 1.) The Court granted in part and denied in part Plaintiffs' motion for preliminary injunction on July 29, 2022. (ECF No. 22.) The preliminary injunction was set to remain in effect for 28 days. (*Id.*) Plaintiffs filed the instant motion to renew or extend the preliminary injunction on August 24, 2022. (ECF No. 24.) Plaintiffs argue, in short, that the forecast for the remainder of August 2022 and September 2022 predicts many days of extreme heat. (*Id.* at 2.) Plaintiffs therefore seek to extend the current preliminary injunction for an additional 30 days. (*Id.*) Plaintiffs also request sanctions against the City, contending that the City violated the Court's prior Order. (*Id.* at 6.)

## II. STANDARD OF LAW

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Costa Mesa City Emps. Ass'n v. City of Costa Mesa*, 209 Cal. App. 4th 298, 305 (2012) ("The purpose of such an order is to preserve the status quo until a final determination following a trial."); *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy.").

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief,

[3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  A plaintiff must "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  In evaluating a plaintiff's motion for preliminary injunction, a district court may weigh the plaintiff's showings on the *Winter* elements using a sliding-scale approach. *Id.*  A stronger showing on the balance of the hardships may support issuing a preliminary injunction even where the plaintiff shows that there are "serious questions on the merits . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.*  Simply put, plaintiffs must demonstrate, "that [if] serious questions going to the merits were raised [then] the balance of hardships [must] tip[ ] sharply" in [p]laintiffs' favor in order to succeed in a request for preliminary injunction. *Id.* at 1134–35.

"A preliminary injunction can take two forms.  A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits.  A mandatory injunction orders a responsible party to take action." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.* (*Marlyn*), 571 F.3d 873, 878–79 (9th Cir. 2009) (internal quotation marks and citations omitted); *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).  Plaintiffs seek a mandatory injunction.  (*See* ECF No. 2.)

"A mandatory injunction goes well beyond simply maintaining the status quo . . . [and] is particularly disfavored." *Marlyn*, 571 F.3d at 879 (citation and internal quotation marks omitted).  A district court should deny a mandatory injunction, "unless the facts and law clearly favor the moving party." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust* (*Park Vill.*), 636 F.3d 1150, 1161 (9th Cir. 2001).  "In general, mandatory injunctions are not granted unless extreme or very serious damage will result[,] and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn*, 571 F.3d at 879 (internal quotation marks and citations omitted); *Garcia*, 786 F.3d at 740.

**III.    ANALYSIS**

The Court previously issued a preliminary injunction to temporarily enjoin the City and all of its officers, agents, servants, employees, attorneys, and all persons under their direction and

control, from clearing encampments belonging to the unhoused.  (ECF No. 22.)  The Court stated that after the expiration of the preliminary injunction, Plaintiffs may once against seek to reinstate the preliminary injunction by filing a motion with this Court making a showing on all of the *Winter* prongs and providing greater detail about the weather forecast for the remainder of the summer months.  (*Id.* at 23.)  In the instant motion, Plaintiffs seek to extend or reinstate this preliminary injunction for 30 days, arguing "the elements this Court deemed satisfied for the issuance of the original Order remain unchanged, if not even more pronounced."  (ECF No. 24 at 6.)  The Court will first address each of the *Winter* requirements in turn, then the City's request for an exclusion, and finally Plaintiffs' motion for sanctions.

           A.        <u>Whether Plaintiffs Make a Showing on All Four Prongs of the *Winter* Test</u>

                i.    *Likelihood of Success on the Merits*

Plaintiffs seek a renewal or extension of the Court's prohibitory injunction and therefore the Court will address whether there is a likelihood of success on the merits.  *See Park Vill.*, 636 F.3d at 1161; *Winter*, 555 U.S. at 20.  Because Plaintiffs' motion is limited to the current injunction against the City, the Court will only address the claims asserted against the City with respect to the clearing of encampments — Claims One and Two.  The Court will consider each claim in turn.

                      a)   <u>Claim One against the City</u>

Plaintiffs allege Defendants have subjected them to state-created danger in violation of the Fourteenth Amendment of the Constitution by clearing or "sweeping" existing encampments and failing to open a sufficient number of cooling centers and other safe, air-conditioned locations.  (ECF No. 1 at 12.)  Plaintiffs do not make a specific argument with respect to this claim, but generally argue the historical weather pattern for the month of September and the forecast for September 2022 show that Sacramento will experience extreme heat days over the month of September.  (ECF No. 24 at 3.)  Plaintiffs also argue the City has repeatedly violated and attempted to violate the current preliminary injunction by continuing to clear encampments and sweep unhoused persons.  (*Id.* at 4.)

///

4

In opposition, the City argues that Plaintiffs' contention is unsupported by expert testimony or admissible evidence and the declaration from Dr. Flojaune Cofer ("Dr. Cofer"), who identifies as a public health expert, is unsupported. (ECF No. 28 at 4–5.) The City notes that it has retained meteorological expert Jan Null ("Null"), a Certified Consulting Meteorologist with the American Meteorological Society, who has opined that, based on a review of daily temperature data from the National Weather Service for downtown Sacramento between 2000 and 2021, there is an average of only 17.5 days with a daily maximum temperature of 90 degrees or over. (*Id.* at 4.)

In reply, Plaintiffs contend Dr. Cofer is qualified as an epidemiologist specializing in vulnerable populations and the City fails to produce a single declaration from a similarly qualified public health or medical specialist to rebut her science-based opinions or the documentation and reports on which she relies. (ECF No. 32 at 2.) Plaintiffs also argue that the City's own "Citywide Unhoused Encampment Response Protocol" set forth in a memorandum dated August 15, 2022, states: "Before relocation of an encampment takes place the City must consider . . . [e]xcessive heat or cold at the time of relocation." (*Id.* at 3–4.) Plaintiffs note the Protocol defines excessive heat as "90 degrees or above in the summer" and also states that "City staff should consider working with local partners to distribute trash bags and sharps containers to encampment residents and, if possible, schedule trash collection." (*Id.* at 4 (citing ECF No. 28-4 at 9).)

There is no fundamental right to housing. *Lindsey v. Normet*, 405 U.S. 56, 92 (1972). However, the Ninth Circuit recognizes liability under substantive due process where a state or local official acts to place a person in a situation of known danger with deliberate indifference to their personal and physical safety. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006).

> In examining whether an officer affirmatively places an individual in danger, [a court does] not look solely to the agency of the individual, nor [should it rest its] opinion on what options may or may not have been available to the individual. Instead, [the court] must examine whether the officer left the person in a situation that was more dangerous than the one in which they found him.

*Id.* In order to prevail under a state-created danger theory, a plaintiff must show (1) there was

5

"affirmative conduct on the part of the state in placing the plaintiff in danger" and (2) the state acted with "deliberate indifference" to a "known or obvious danger." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) (citing *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000); *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).

Plaintiffs assert that the City has posted notices to vacate in the Morrison Creek area, even though they concede that the City ultimately did not conduct the clearings. (ECF No. 24 at 4.) Plaintiffs also submit the declaration of Jessica Gilbert ("Gilbert"), who details an incident in which Sacramento police officers entered a tent occupied by he and her partner Joseph Jensen ("Jensen"), while Gilbert was five months pregnant. (*Id.* at 5.) Gilbert avers in her declaration:

> On or about August 7, 2022[,] I was residing in a tent with my partner under Highway 50 in Sacramento, California where we had shade to protect us from the extreme hot weather we were experiencing at the time. At around 10:40 am in the morning I was awakened by two Sacramento police officers who pulled my tent open and told me to leave the area. I believe the female officer was named [Streich] and the male officer was named Kirtland or Kirkland. I became very scared. They asked me to come outside of my tent to talk with them, and I overheard Officer [Streich] say, "I just scared the shit out of them." She was laughing when she said this . . . Both Mr. Jensen and I complied and stepped out of our tent. Officer [Streich] then said "We really can't tell you to move, but unfortunately, you guys can't stay here." Then she said, "I know it's nice and shady over here, but you need to find a different place to go. You guys can't stay here." I felt very intimidated by these officers. They asked if we wanted help with resources and took our phone numbers. Then we left . . . We had nowhere to go and the police did not give us any information about cooling centers or anywhere else we could go. It was about 100 degrees that day. We left and spent the day walking the sidewalks while the sun was very stressful until we finally found an area by 13th Street that was shady. We stayed there one week until approximately August 13, 2022[,] when two other Sacramento police came . . . On or about August 13, 2022, two Sacramento police officers came and told us we had two hours to pack our things and leave or they would take all our possessions. We packed as fast as we could and left. That time we ended up on the street again . . . At no time was either myself or my partners offered any help and we never got a call from Homeless Services although we had given our phone numbers to before to Officers [Streich] and [Kirtland] . . . .

(ECF No. 24-1 at 1–2.) The City contends both Sacramento Police Sergeant Joshua Kirtland and Officer Kelli Streich were wearing body worn cameras during their interaction with Gilbert and Jensen, which shows that the officers arrived at Gilbert and Jensen's location in response to a 311 complaint about a sidewalk being completely blocked by a tent. (ECF No. 28 at 7.) The City

6

1  notes both officers confirmed the sidewalk was completely blocked by a tent and a car registered
2  to Gilbert was illegally parked in a no parking zone next to the large tent blocking the sidewalk.
3  (*Id.* at 7–8.)  The City states Sergeant Kirtland asked Gilbert and Jensen to remove their tent
4  because it was blocking the sidewalk and "was a public safety issue because citizens would be
5  forced to go around the tent and onto the road, potentially getting struck by a vehicle." (*Id.* at 8.)
6  The City notes that it has no record of any contact between police department personnel and
7  Gilbert and Jensen on August 13, 2022. (*Id.*)  Although the City submitted the body worn camera
8  footage to the Court, the Court was unable to open the file and could not locate any files
9  containing the footage.  However, the City neither provides nor does the Court have any reason to
10 disbelieve Gilbert and Jensen's assertion that other officers asked them to move on August 13,
11 2022.
12         Additionally, as stated by the City, Null avers in his declaration that an analysis of the
13 daily maximum temperatures for the period of 2000 through 2021 for Sacramento shows that "in
14 August there are an average of 22.5 days with daily maxima of 90 degrees or greater" and "in
15 September there are an average [of] 17.5 days in the same category." (ECF No. 28-2 at 2.)
16 However, Dr. Cofer attaches to her supplemental declaration as Exhibit A a copy of a report
17 entitled "Monthly Weather" from the National Weather Service website, which depicts
18 temperatures predicted for the Sacramento area for September 2022.  (ECF No. 24-1 at 7–9.)
19 Exhibit A shows that the daily maximum temperatures for the first three weeks of September
20 2022 are predicted to be 90 degrees Fahrenheit or higher.  (*Id.* at 8.)  District courts are entitled to
21 take judicial notice of adjudicative facts *sua sponte*.  Fed. R. Evid. 201(c)(1).  Accordingly, the
22 Court also takes judicial notice of an updated monthly forecast for September 2022 published by
23 AccuWeather.  September 2022, AccuWeather,
24 https://www.accuweather.com/en/us/sacramento/95814/september-weather/347627?year=2022
25 (last visited August 31, 2022).  The forecast shows that daily maximum temperatures are slated to
26 be above 90 degrees Fahrenheit, with eight out of the first ten days of September 2022 exceeding
27 100 degrees Fahrenheit, which is higher than the data provided by Plaintiffs.
28 ///

7

Dr. Cofer states she is employed by Public Health Advocates for the State of California and she set forth her credentials in her previous declaration (*see* ECF No. 2-2 at 1–3) as a public health expert specializing in public health issues impacting marginalized, at-risk communities, including the unhoused. (ECF No. 24-1 at 4–5.) Dr. Cofer avers in her declaration:

> Based upon the [attached] Exhibits and my professional education, training and experience in public health as described in my earlier declaration, which includes comprehensive familiarity with weather extremes and their impact on unsheltered, unhoused communities in Sacramento, where I live and work, I draw the following conclusions . . . First, persons exposed unprotected to extreme heat, i.e., temperatures in the range of 95 degrees Fahrenheit to triple-digits. are actually exposed to substantially higher temperatures based upon the absorption, reflection and retention of heat by asphalt, concrete and heat-storing buildings and building materials. These temperatures can range anywhere from 20 to 30 degrees higher than the ambient temperature and can remain at that range far into the night after sunrise [sic] . . . Second, there is no doubt that Sacramento will experience at least eight and possibly more days of extreme heat during the month of September, 2022 as was the case last September 2021. Removed from shaded, relatively sun and heat-protected areas, unhoused, unsheltered persons are at extreme risk of dehydration, hyperthermia, heat stress, heat stroke and other heat-related conditions that may cause irreversible damage and possibly death . . . Third, the effects of exposure of unsheltered, unprotected persons to extreme heat are cumulative. This means, for example, that a person exposed to a temperatures of 95 degrees Fahrenheit or greater on any given day, even if followed subsequently by lower temperatures will nevertheless continue to be at risk for heat-related disease and death, as the effects of repeated. even intermittent. exposures to extreme heat are cumulative. It is a commonplace occurrence for a person so exposed to suffer heat stroke and other potentially lethal heat-related events days and even weeks after the extreme temperatures abate.

(ECF No. 24-1 at 5–6.)

As stated in the Court's prior Order, this Court has already held that a plaintiff's allegations regarding a defendant municipality's efforts to confiscate and seize unhoused plaintiffs' shelters and possessions during extreme weather were sufficient to establish the defendant could "knowingly place the [unhoused] at increased risk of harm." *Jeremiah v. Sutter Cnty.*, No. 2:18-cv-00522-TLN-KJN, 2018 WL 1367541, at *5 (E.D. Cal. Mar. 16, 2018). Another court has concluded that plaintiffs were unable to plead a state-created danger claim where "the generalized dangers of living on the street" were not accompanied by "allegations of intentional eviction during precarious weather or other facts indicating deliberate indifference to

8

the safety and welfare of the population." *Cobine v. City of Eureka* (*Cobine I*), 250 F. Supp. 3d 423, 433 (N.D. Cal. 2017).

Although the evidence is much more limited in the instant motion, Plaintiffs' declarations still adequately detail heat-related mortality and morbidity deaths and illnesses from heat exposure. (*See* ECF No. 24-1 at 1–2, 4–6.) In light of the "risk of dehydration, hyperthermia, heat stress, heat stroke and other heat-related conditions that may cause irreversible damage and possibly death" that could accompany sweeps as detailed above, the Court finds that the City's sweeping or clearing of encampments in extreme heat to be "affirmative conduct" on the part of the City in placing Plaintiffs in danger. *Patel*, 648 F.3d at 974. As stated in the Court's prior Order, Plaintiffs also adequately establish through Union President Crystal Sanchez's declarations, as well as Gilbert's declaration, that the City acted with "deliberate indifference" to the "known or obvious danger" of extreme heat. *Id.*; (*see also* ECF No. 2-1 at 7; ECF No. 21 at 2, 4; ECF No. 24-1 at 1–2.)

Based on the foregoing, the Court finds that Plaintiffs are likely to succeed on the merits with respect to clearing encampments. *See Winter*, 555 U.S. at 20.

b) <u>Claim Two against the City</u>

Plaintiffs allege Defendants have subjected them to state-created danger in violation of Article I, § 7 of the California Constitution by "sweeping" existing encampments and failing to open a sufficient number of cooling centers and other safe, air-conditioned locations. (ECF No. 1 at 13.) Although the parties do not expressly delineate their arguments claim by claim, it appears the parties' argument as to this claim largely overlap with the arguments made for the first claim. (ECF Nos. 24, 28, 32.)

Article I, § 7(a) of the California Constitution states: "A person may not be deprived of life, liberty, or property without due process of law." The due process guarantee under the California Constitution has been construed consistently with the due process guarantee under the U.S. Constitution and in some cases extends broader protections. *See Garfinkle v. Superior Court*, 21 Cal. 3d 268, 281–82 (1978); *San Jose Police Officers Ass'n v. City of San Jose*, 199 Cal. App. 3d 1471, 1478–79 (1988) ("The difference between California and federal law stems

from *People v. Ramirez* . . . Under *Ramirez*, when a person is deprived of a statutorily conferred benefit, due process analysis must start not with a judicial attempt to decide whether the statute has created an entitlement that can be defined as liberty or property, but with an assessment of what procedural protections are constitutionally required in light of the governmental and private interests at stake.") (citing *People v. Ramirez*, 25 Cal. 3d 260, 263–64 (1979)) (internal quotation marks omitted). As these broader protections conferred by the California Constitution are not applicable in the instant case because it does not involve a statutorily conferred benefit, the Court concludes the second claim will have an identical outcome to the first claim. Accordingly, with respect to sweeps of encampments, Plaintiffs are likely to succeed on the merits.

         *ii.*   *Irreparable Harm, Balancing of Equities, Public Interest*

The Court notes that Plaintiffs' instant motion does not address the *Winter* elements of irreparable harm, balance of equities, or the public interest. When the Court asks Plaintiffs to adequately make a showing on all the *Winter* elements when seeking a preliminary injunction (or generally provides any instructions in the future), it expects Plaintiffs to fully comply. However, as the Court finds that these elements remain largely unchanged from the issuance of its July 29, 2022 Order, this omission is not fatal to Plaintiffs' motion.

The City makes an additional argument in its opposition with respect to public interest. (ECF No. 28 at 5–6.) The City argues the Court should deny Plaintiffs' motion because an extension would be extremely detrimental to the health and safety of the City's residents. (*Id.*) Specifically, submits the declarations of Sacramento Fire Marshall Jason A. Lee ("Lee"), Sacramento Police Lieutenant Ryan Bullard ("Bullard"), City Park Ranger Danielle Luther ("Luther"), Operations and Maintenance Superintendent Doug Henry ("Henry"), and Sacramento Police Captain Bruce Heinlein ("Heinlein"), all of which discuss the detrimental health and safety impacts. (*Id.* at 5.) The City contends these impacts include, but are not limited to, the following: "[a]n increase in human waste and refuse at numerous locations, overall increased health risks to citizens, increased risk of fires at various locations, compromised security at Sacramento Regional Transportation sites where security is provided by Sacramento Police employees, increased risk of flooding at creeks, channels, and other waterways, and an overall increase in

criminal activity." (*Id.*)  The Court has reviewed these declarations.  Heinlein avers:

> Since the time Judge Nunley's preliminary injunction was issued, [Sacramento Police Department ("SPD")] has experienced an increase in calls for service and community complaints regarding the increase in crime involving [persons experiencing homelessness ("PEH")], the storage of excessive personal property, trash, human feces, and lack of access to public sidewalks/easements.  Since the preliminary injunction went into effect, encampments have continued to grow to the point where camp management has become extremely difficult.  In addition, there have been several large-scale fires reported throughout the City, which were found to have originated at encampments where PEH are living.  These fires have placed the community at significant risk of physical harm and have also caused significant property damage.  (See fire incident video sent to SPD by Sacramento resident attached hereto as Exhibit A.)  During the time Judge Nunley's preliminary injunction remained in place, and continuing through to the present, SPD continues to offer resources to PEH through the City's Department of Community Response ("DCR"), and the City's 311 and 211 systems . . . An extension of the Order will compound the issues above, creating a significant decrease in the quality of life for people who live, work, and visit the City, and would significantly increase threats to the public health and safety of everyone within the City.  Police and City services are significantly strained with the growing encampments and increasing calls for police services related to encampments.

(ECF No. 28-4 at 2.)  The Court has also reviewed the video filed as Exhibit A to Heinlein's declaration, which depicts a very serious and dangerous fire at an encampment.  (*See* Exhibit A to Affidavit of Capt. Bruce Heinlein Video.)  Similarly, Henry, who oversees the operation and maintenance of all critical Department of Utilities ("DOU") storm drainage collection facilities, avers:

> As a result of the preliminary injunction, however, DOU has been unable to access critical infrastructure sites to perform proper evaluations, maintenance and repairs of locations that may present a potential threat of flood to the residents of the City, including PEH, which were scheduled for the month of August 2022. (See 2022 Critical Infrastructure Maintenance Schedule attached hereto as Exhibit A).  This maintenance is extremely critical to ensure that creeks, channels, levees, and other infrastructure are in a condition to prevent flooding during the wet season that could threaten lives, damage homes, and other private property within the City.  Due to the preliminary injunction, DOU will also be behind in the evaluations, maintenance and repairs for the month of September, 2022 . . . Due to the preliminary injunction, it is also uncertain whether DOU will be able to complete all evaluations, maintenance and repairs necessary by October 31, 2022, a deadline imposed on the City by the State Department of Fish and Wildlife.  Absent further delays, DOU may be able to complete the work by adopting an alternative schedule that will require DOU to do the following: (1)

> modify all dates scheduled for the remainder of the year; (2) spend an estimated 1,500 hours of overtime at an extra cost of approximately $98,000 to our rate payers; and (3) setting aside almost all other preventative maintenance activities within the City to focus on delayed maintenance to prevent flooding of the City . . . One of the biggest challenges DOU faces is the inability to measure the likelihood of loss to life, potential damage to homes, and potential damage to other property, until PEH are relocated, and the critical infrastructure and adjacent areas are cleaned up. For example, in the past, DOU staff has discovered extensive damage to levees apparent only after DOU was allowed to clean and inspect this critical infrastructure. (See photographs of Union House Canals located within the City, attached hereto as Exhibit B.) . . . Exempting the City's Critical Infrastructure from any extension of the preliminary injunction would assist DOU to protect life, homes, and other private property. (See City of Sacramento's Critical Infrastructure Ordinance attached hereto as Exhibit C.) These protections include protecting the life of PEH and their property. DOU has specific protocols related to critical infrastructure, which are targeted to safeguard the public health and safety of the City. (See City of Sacramento's Standard Operating Procedures: Critical Infrastructure Cleanup attached hereto as Exhibit D.)

(ECF No. 28-5 at 2–4.) With respect to the danger of highly flammable materials present in encampments, Fire Marshall Lee avers:

> As a result of the current Order preventing the abatement of unlawful encampments throughout the City, there has been a significant accumulation of highly flammable materials throughout the City, but importantly, near commercial and residential properties, within highly flammable open space areas, and within close proximity to critical infrastructure. This accumulation of flammable materials poses the following risks:
>
> • Extreme fire danger from the accumulation of rubbish, wastepaper, boxes.
>
> • Hazardous off-gassing of numerous toxic gases produced by the burning of discarded rubber tires containing benzene, toulene, and sulfur among other chemicals.
>
> • Exacerbation of existing fire risk caused by high fuel load due to the improper handling and storage of highly flammable compounds such as gasoline, propane, engine oil, and other various vehicle fluids.
>
> • The obstruction of fire escapes, stairways, doors, and windows restricting or prohibiting ingress and egress of both members of the public as well as First Responders during fire or medical emergencies.
>
> This list is illustrative, but not exhaustive, of items commonly found at, and risks imposed by numerous unlawful encampments, but which [Sacramento Fire Department ("SFD")] has been prohibited

> from abating due to the application of the current Order. (See a true and correct copy of pictures from several site inspections conducted by myself and SFD inspectors at unlawful encampments attached hereto as Exhibit B.) . . . Should the preliminary injunction be extended, the ongoing risk of extreme fire hazard will continue to increase as the accumulation of dangerous and hazardous materials continues unabated. As a result, members of the public, including PEH, and First Responders will be placed at an extreme and unnecessary risk of injury and property loss due to fire . . . Based on my training and experience, the inability of SFD to abate the extreme fire danger posed by the accumulation of highly flammable materials at unlawful encampments due to the preliminary injunction, and any extension thereof, would constitute an immediate, serious hazard that threatens the City and its residents.

(ECF No. 28-6 at 2–3.) Park Ranger Sergeant Luther states that encampments usually contain conditions such as vector issues, environmental contamination to water access, extreme fire hazards, protected habitat destruction, compromised levee infrastructure, decreased safety and availability of non-motorized multi-use paths, and increased probability of unintended exposure to open, uncapped, and/or contaminated needles. (ECF No. 28-7 at 2.) Luther further avers:

> Since the time the preliminary injunction was issued, the Department has experienced a significant increase . . . [in] the conditions described above, and the task of maintaining and preserving the health and safety of the City's parks, recreational areas, and open spaces, has been impaired. Consequently, the Department [of Youth, Parks, and Community Enrichment] is now faced with an increasing number of threats to public health and safety of its residents, including PEH, arising from these encampments, and the Department lacks the ability to abate the situation due to the preliminary injunction . . . A prime example of current unlawful structures threatening the public health and safety of the City's parks and residents is located at Del Paso Regional Park. This multi-use space is unique due to its size, vast array of amenities, and the Arcade Creek that runs through the length of the park and open space. Due to the concealed nature of the open space and proximity to resources like gas stations and convenience stores, this area is a prime target for PEH to establish camp sites. (See photos of unlawful structures attached hereto as Exhibit A.) . . . An extension of the preliminary injunction will compound and exacerbate the hazards and concerns, described above, beyond their already extreme conditions. More significantly, an extension or the preliminary injunction will significantly decrease the quality of life for City residents who live, work, and visit the City, and would significantly increase threats to the public health and safety of the parks, opens spaces, and the City's residents. These hazards, if prolonged, will also result in the decreased efficiency and effectiveness of both Park Rangers and Park Maintenance staff to work on preserving the health, accessibility and safety of the City's parks and open spaces.

(*Id.* at 3–4.)  Finally, Lieutenant Bullard avers:

> As a result of this preliminary injunction preventing the abatement of unlawful encampments at [Sacramento Regional Transit District ("SacRT")] properties, the officers under my command have been unable to intervene with persons attempting to camp in SacRT bus stops, and other encampments located on SacRT property, which have been identified as centralized locations of criminal activity. Additionally, as a major effect of the preliminary injunction, PEH have set up encampments in areas that are considered within close proximity of critical infrastructure, including SacRT rail lines. . . The broad nature of the preliminary injunction prevents the abatement of encampments at SacRT properties and locations, the mitigation of security issues related to unlawful encampments, and impairs infrastructure security.  More significantly, without ongoing enforcement authority or ability to ensure that PEH can no longer occupy SacRT properties, locations, and critical infrastructure, the unit under my command cannot uphold its contractual obligations to Sacramento Regional Transit . . . Any extension of the current prior preliminary injunction would only exacerbate the issues discussed above. Additionally, an extension would further prevent the Police Services from fulfilling its contractual obligation to SacRT.

(ECF No. 28-8 at 2–3.)

The Court does not take the foregoing lightly and understands the weight of issuing another preliminary injunction.  It is clear from the City's declarations that the preliminary injunction to prevent the City from clearing encampments has a serious impact on public health and safety.  However, for Plaintiffs, protection from the extreme heat could possibly be a matter of life or death.  Plaintiffs' declarations detail heat-related mortality and morbidity deaths and illnesses from heat exposure (*see* ECF No. 2-1 at 7; ECF No. 21 at 2, 4; ECF No. 24-1 at 1–2, 4–6), and the Court finds the harm Plaintiffs allege to be potentially severe — especially in light of the triple-digit weather predicted for the upcoming week.  Therefore, the Court still finds that the City's interest in clearing encampments during extreme heat events is far outweighed by Plaintiffs' interest in their own health and welfare.  As the Court also stated previously, courts have found there is a strong "public interest in maintaining the protection afforded by the constitution to those most in need of such protections."  *Cobine v. City of Eureka* (*Cobine II*), No. C 16-02239 JSW, 2016 WL 1730084, at *7 (N.D. Cal. May 2, 2016).  Plaintiffs are unhoused individuals, who are persons "most in need of such protections."  Accordingly, the Court finds the Plaintiffs have demonstrated irreparable harm, the balance of equities tips in favor of Plaintiffs,

and the public interest is served by the issuance of an injunction.

       *iii.*  Bond

  Although the parties do not address this issue, the Court waives the discretionary bond requirement set forth in Federal Rule of Civil Procedure 65(c). *See Governing Council of Pinoleville Indian Cmty. v. Mendocino Cnty.*, 684 F. Supp. 1042, 1047 (N.D. Cal. 1988) (citing *People of California v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985)) ("[C]ourts have discretion to excuse the bond requirement . . . ."). Plaintiffs are unhoused individuals who are unable to afford adequate housing and to require bonds would place them in a further position of hardship.

  In sum, Plaintiffs have adequately "[made] a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *All. for the Wild Rockies*, 632 F.3d at 1135. Accordingly, Plaintiffs' motion to extend or reinstate the preliminary injunction is GRANTED.

    **B.**  <u>The City's Request for an Exception</u>

  The City requests that if the Court grants Plaintiffs' motion "the areas within the City generally identified in Chapter 8.140 be exempted from the Court's order." (ECF No. 28 at 6.) The City also requests that its recent ordinance passed on August 23, 2022, which allows removal of all tents that block sidewalks and business entrances in the City, not be suspended. (*Id.*)

  In reply, Plaintiffs contend the City's proposed exception would nullify the preliminary injunction altogether because the City's definition of "critical infrastructure" is so overbroad that it essentially prohibits camping across the City and "in precisely those areas where there is shade and protection from the sun and heat by way of overpasses, trees and other shaded locations." (ECF No. 32 at 4.) Plaintiffs cite to a February 2016 Sacramento Bee article which states that there are "thousands of miles of pipeline" and "seven underground natural gas fields in the Sacramento region [which] offer little surface-level evidence of the billions of cubic feet of natural gas under storage," to suggest that the unhoused could be banned from areas of relative shade and other means of protection from the sun through large sections of the City. (*Id.* at 5 (citing ECF No. 32-1 at 21–22).) Plaintiffs also assert the Court should not permit the City to enforce its new ordinance because it was passed days before the expiration of the previous

15

preliminary injunction and "appears to be an attempt to bootstrap a legislative shield and sword against the injunction that was in place at the time of its passage." (*Id.*)

Chapter 8.140.030 of the Sacramento City Code deems it "unlawful and a public nuisance for any person to camp, occupy camp facilities, or use camp paraphernalia" at:

> 1. Critical infrastructure;
>
> 2. Within 25 feet of critical infrastructure;
>
> 3. Within 25 feet of a vehicular or pedestrian entrance or exit of critical infrastructure;
>
> 4. On those portions of a right-of-way that are required by local, state, or federal law to be free of obstruction to first responders, including but not limited to members of law-enforcement, fire-prevention, or emergency-medical-services agencies;
>
> 5. Within a hollow sidewalk; or
>
> 6. Wildfire risk area.

Sacramento, Cal., Health & Safety Code § 8.140.030. "Critical infrastructure" is defined as:

> 1. Levees; or
>
> 2. Real property or a facility, whether privately or publicly owned, as approved by resolution of the city council, that the city manager designates as being so vital and integral to the operation or functioning of the city that its damage, incapacity, disruption, or destruction would have a debilitating impact on the public health, safety, or welfare.
>
> Critical infrastructure may include, but is not limited to, government buildings, such as fire stations, police stations, jails, or courthouses; hospitals; structures, such as antennas, bridges, roads, train tracks, drainage systems, or levees; or systems, such as computer networks, public utilities, electrical wires, natural gas pipes, telecommunication centers, or water sources.

*Id.* § 8.140.020.

The Court finds that these exclusions from its preliminary injunction could severely limit the scope of the preliminary injunction. It appears from these ordinances that the City could very easily exempt vast portions of City property "as being so vital and integral to the operation or functioning of the city that its damage, incapacity, disruption, or destruction would have a debilitating impact on the public health, safety, or welfare." If the City were to do so, the preliminary injunction would have a very limited effect in actually protecting unhoused

individuals from the extreme heat. The Court also agrees with Plaintiffs that the newly passed ordinance does not trump the remaining elements of the balance of hardships tipping in Plaintiffs' favor, the irreparable harm to Plaintiffs, and the likelihood of success on the merits in favor of Plaintiffs the Court found as the basis for its July 28, 2022 Order. (ECF No. 32 at 5–6.) Accordingly, the Court denies the City's request.

### C. Plaintiffs' Motion for Sanctions

Plaintiffs request the Court "issue appropriate sanctions against the City . . . for its violations of the [July 29, 2022] Order and in order to deter future violations should the Court determine that extension or [reinstatement] of the [p]reliminary [i]njunction be appropriate." (ECF No. 24 at 6.) In opposition, the City argues Plaintiffs' motion does not set forth admissible facts that support their claim that the City or any City employee violated the Court's prior preliminary injunction. (ECF No. 28 at 7.) The City notes that Plaintiffs even concede the City called off scheduled clearings or that certain clearings never took place. (*Id.*) With respect to the incident with Gilbert and Jensen on August 7, 2022, the City contends that as indicated by the body camera video recordings, both officers confirmed the sidewalk was completely blocked by a tent and a car registered to Gilbert was illegally parked in a no parking zone next to the tent. (*Id.* at 7–8.) The City maintains that it does not have any record between any SPD personnel and Gilbert and Jensen on August 13, 2022. (*Id.* at 8.) The City requests an opportunity to be heard and to present evidence during an evidentiary hearing in response to Plaintiffs' contentions. (*Id.* at 8–9.)

In reply, Plaintiffs contend the body camera footage corroborates the facts set forth in Gilbert's declaration and also shows a person walking on the sidewalk did not have to go into the street to get around the tent, but rather crossed the street at a controlled intersection and used the sidewalk on the other side. (ECF No. 32 at 3.)

"[T]he burden in any contempt action is on the plaintiff to prove by clear and convincing evidence that the defendant is in contempt of a clear and definite order." *Ford Motor Credit Co. LLC v. Gilbert Auto Ford, LLC*, No. 2:13-cv-00104-BLW, 2013 WL 3804923, at *2 (D. Id. July 19, 2013). Once the plaintiff meets this burden, it shifts to the defendant to establish why it

17

1    cannot comply. *Id.* (citing *In re Bennett*, 298 F.3d 1059, 1069 (9th Cir. 2002); *F.T.C. v. Verity*
2    *Int'l, Ltd.*, 140 F. Supp. 2d 313, 315 (S.D.N.Y. 2001) (A finding of contempt for failure to
3    comply with preliminary injunction is appropriate if there was a clear and valid order and
4    defendants, knowing of that order, failed to comply and made no diligent effort to do so)).

5        In the instant case, it is undisputed that the Court issued a preliminary injunction in its
6    July 29, 2022 Order and there is no doubt the City knew about the injunction. Plaintiffs point to
7    an instance on August 7, 2022 in which SPD officers interacted with Gilbert and Jensen and the
8    officers asked Gilbert and Jensen to move their tent which was taking up the entire sidewalk and
9    to move Gilbert's car because it was illegally parked. As previously stated, the Court was unable
10   to review the body worn camera footage. Plaintiffs also point to an instance on August 13, 2022,
11   in which officers allegedly ordered Gilbert and Jensen to leave the shaded area. (ECF No. 24 at 5
12   (citing ECF No. 24-1 at 1–2).) In other incidents in which notices to vacate were posted,
13   Plaintiffs concede the City never actually conducted the clearing — including the notice posted
14   after the issuance of the preliminary injunction. (*See* ECF No. 24-1 at 29.)

15       Assuming without deciding that Plaintiffs' assertions regarding the incidents with Gilbert
16   and Jensen are true, the Court in its discretion declines to impose sanctions at this time, especially
17   in light of the fact that Plaintiffs have not asked for any specific sanctions. The Court enjoins the
18   City and all of its officers, agents, servants, employees, attorneys, and all persons under their
19   direction and control from clearing encampments belonging to the unhoused until after Friday,
20   September 23, 2022. Plaintiffs may bring a renewed motion for sanctions asking for specific
21   sanctions should they learn the City is violating this Order. If the Court learns the City has
22   violated this Order, the Court will not hesitate to issue sanctions in the future. Accordingly,
23   Plaintiffs' motion for sanctions is DENIED.

24       **IV.**    **CONCLUSION**

25       Based on the foregoing, Plaintiffs' Motions to Extend or Reinstate the Preliminary
26   Injunction is GRANTED and Plaintiffs' Motion for Sanctions is DENIED. (ECF No. 24.) The
27   City and all of its officers, agents, servants, employees, attorneys, and all persons under their
28   direction and control are enjoined from clearing encampments belonging to the unhoused. A

1  district court has the authority *sua sponte* to order or modify injunctive relief.  *Armstrong v.*
2  *Brown*, 768 F.3d 975, 980 (9th Cir. 2014) (citing *Clement v. Cal. Dep't of Corrs.*, 364 F.3d 1148,
3  1150 (9th Cir. 2004); *Brown v. Plata*, 563 U.S. 493, 542–43 (2011)).  Although Plaintiffs request
4  to extend the preliminary injunction for an additional 30 days, the Court notes that the extreme
5  heat days in the month of September are forecasted to largely end after the third week of the
6  month.  Accordingly, the preliminary injunction will be in effect until Friday, September 23,
7  2022.

    IT IS SO ORDERED.

DATED:  September 2, 2022

Troy L. Nunley
United States District Judge