Anthony D. Prince (SBN # 202892)
General Counsel, California Homeless Union/Statewide Organizing Council
Law Offices of Anthony D. Prince
2425 Prince Street, Ste. 100
Berkeley, CA 94705
Tel: 510-301-1472

Attorneys for Plaintiffs

Page | - 1 -

**UNITED STATES COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SACRAMENTO HOMELESS UNION, a local of the CALIFORNIA HOMELESS UNION/STATEWIDE ORGANIZING COUNCIL, on behalf of itself and those it represents; BETTY RIOS; DONTA WILLIAMS; FALISHA SCOTT and all those similarly situated,<br><br>Plaintiffs<br><br>vs.<br><br>COUNTY OF SACRAMENTO, a political subdivision of the State of California; CITY OF SACRAMENTO, a municipal corporation; and DOES 1 – 100,<br><br>Defendants. | Case No.: 2:22-cv-01095-TLN-KJN<br><br>*EX-PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND RE-INSTATEMENT OF PRIOR PRELIMINARY INJUNCTION or FOR NEW PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF CRYSTAL SANCHEZ; MAYRA PASTORE, PhD; HERMAN BARAHONA; CHARLES PFOST; LISA BARNES; LACY DuBOIS; ANGELA WALLACE; WILLIAM McGUINESS; VINCENT BELL; DECLARTION OF ANTHONY D. PRINCE; [Proposed] ORDER<br><br>Hearing Date: August 10, 2023<br>Time: 2:00 pm<br>Courtroom 2, 15th Floor |

**INTRODUCTION AND BACKGROUND**

### "Sacramento clears homeless camp before triple-digit heat wave. Where will they go?"

So read the headline in the July 19, 2023 edition of the Sacramento Bee, (Exhibit G to the accompanying Declaration of Crystal Sanchez), reporting that one day earlier the City of Sacramento cleared thirty persons from an encampment on "C" Street. "Ahead of a three-day

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

stretch of triple-digit temperatures," reads reporter Theresa Clift's story, "the city of Sacramento on Wednesday cleared over 30 homeless people from a mid- town, tree-lined street that offered shade."(*Id.*)

Last year, as the Summer of 2022 brought record-setting excessive heat to the City and County of Sacramento, this Court issued two successive preliminary injunctions which, in pertinent part, directed the City of Sacramento to cease its policy and practice of displacing unsheltered persons from areas where shade provided by trees and other vegetation as well as under freeway overpasses, bridges, buildings, etc. offered a modicum of protection from the sun and excessive heat. Now, the summer of 2023 has already brought record extreme temperatures to a city where since last year, the number of unsheltered, unhoused persons jumped 67% from an official Point in Time count of 5,570 in 2022 to a current record 9, 278 homeless Sacramentans in 2023. Now, once again, Defendant City of Sacramento has resumed this cruel practice as temperatures are forecast to soar into the triple-digits by the end of this week.

For homeless campers For George Russell and Alicia Peterson, as reported by the Sacramento Bee, the July 19 sweep at "C" street included the City's seizure and destruction of their mattresses, clothing and tents. Exiled to the sweltering city streets without these vital survival items meant a dramatically increased risk of heat-related injury and death. See, Declarations Mayra Pastore, PhD; Herman Barahona; Crystal Sanchez. See also, Declaration and Supplemental Declarations of Flojaune Cofer, PhD, ECF No. 2-2 and ECF No. 24-1 filed in 2022 in support of Plaintiffs' Motion for Injunctive Relief.)

The City justified the July 19, 2023 sweep by claiming violation of a sidewalk obstruction ordinance that was enacted in August, 2022, only days before this Court granted Plaintiffs' motion to reinstate and extend its previous order enjoining the City from conducting homeless sweeps during last summer's extreme heat. However, as reported in the Sacramento Bee, and witnessed by

those who were swept from "C" street on July 19, 2023, "most of the tents were pitched on the grassy strip adjacent to the sidewalk." See, Sanchez Declaration.

The City "offered" to relocate the displaced campers to its "Safeground" Site at Miller Park. However, all 17 of the trailers at the Park were and still are occupied and tents are placed directly on asphalt bringing temperatures in the tents up to triple digits as well as exposing those inside to dangerous toxins released by the extreme heat. Some 60 tents are crowded together with virtually no space between them, no cover over them and in direct sunlight while on the other side of the fence, inside Miller Park, itself, is a dense stand of broadly crowned shade trees no more than 25 yards away, but not close enough to provide any protection to the residents (Declarations of Pfost, Barahona and Sanchez.)

In addition, as detailed in the declarations filed herewith in support of plaintiffs' motion, the City now has new legislative tools that it is using and misusing to dramatically escalate and intensify the sweeps. Some of these tools were created last summer during the pendency of this Court's previously ordered preliminary injunction, and now include a "sidewalk" ordinance and the voter-approved Measure O, which authorizes any person to initiate a lawsuit against the City of Sacramento for failure to clear homeless encampments. (Sanchez Declaration.)

Add to this, the effect of unprecedented public demands first by Presiding Judge of the Sacramento Superior Court Michael G. Bowman and then newly-elected Sacramento District Attorney Thien Ho by way of widely publicized letters dated June 29, 2023 and June 30 2023, respectively. (See, Declaration of Anthony D. Prince.)

Addressed to Mayor Darrell Steinberg and members of the Sacramento City Council, Judge Bowman urged an "increased police presence" at and around the main courthouse to "enforce code violations" against unhoused persons who, he alleged, were threatening "access to justice" for court employees as well as "victims, witnesses and jurors."

Page | - 3 -

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

For his part District Attorney Ho wrote that "[t]he proliferation of encampments on downtown streets has closed businesses, endangered people's safety and is slamming the door of justice shut on those that need it most." As described in the declaration of plaintiffs' counsel Anthony Prince, within days of their publication, the letters were cited by the Sacramento City Attorney in an email dated July 3, 2023 halting the meet and confer process that had been underway: "As you know, the Presiding Judge of the Superior Court and the District Attorney recently raised health and safety concerns due to the unhoused around court facilities and the District Attorney's Office." Although the Union continued to pursue informal resolution before filing this motion, on July 14, 2023, the City again pointed to Judge Bowman's and D.A. Ho's letters in an email rejecting the Unions proposals: "Additionally, the City is being threatened by a lawsuit by the District Attorney's Office for failing to enforce City codes dealing with the unhoused."

As Homeless Union President Crystal Sanchez states in her declaration, "The letters from Judge Bowman and D.A. Thien Ho were widely publicized and resulted in clearing unhoused persons from the shade provided by tree-line streets in the downtown area as well as by the courthouse, itself, which, situated above the streets had provided shade in the public plaza that surrounds the building. I have personally recognized many people who feared the police, left the courthouse and are now in unshaded parts of town in the burning sun."[1]

Accordingly, efforts to negotiate a moratorium on the displacements having failed, Plaintiffs now pray this Court will reinstate and expand the preliminary injunctions that brought much needed relief to thousands of our unhoused Union members and the broader homeless community last year or issue a new order enjoining defendants from enforcing ordinances that result in the forced

---

[1] Judge Bowman has so far declined repeated requests to meet with the Union. However, since holding a press conference and disputing what Union leaders consider exaggerated claims of rampant crime, District Attorney Thien Ho has reached out and invited Homeless Union representatives to a meeting now tentatively scheduled for August 2, 2023.

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

displacement of the unsheltered from areas of relative protection from extreme into more dangerous circumstances.

**FACTS**

In its "Citywide Homelessness Response Protocol," the City of Sacramento defines 90 degrees Fahrenheit or greater as being "excessive heat," a factor which the Protocol requires be taken into consideration before "relocation of a [homeless] encampment takes place." (See, Declaration of Crystal Sanchez) Other factors include "whether social services are available", "availability or lack of shelter" and "transportation challenges to a shelter (sic.)" Already, since June 29, as the summer of 2023 gets underway, Sacramento has had thirty-one (31) days during which temperatures reached 90 degrees or higher, including 15 days on which temperatures exceeded 95degrees and eight days in which temperatures in triple-digits were recorded. (See, Declaration of Crystal Sanchez).

For the month of August, 2023, it is predicted that temperatures of 90 degrees or greater will occur on twenty-one (21) days, including nine days where temperatures will reach 95 degrees Fahrenheit or greater and eight days during which the temperature will climb to double digits. (Sanchez Decl.)

Yet, in complete disregard of its own protocols, the City of Sacramento continues to conduct widespread clearing of homeless encampments, during which, in the vast majority of cases, homeless persons are being displaced from areas of relative protection from the sun and heat into more exposed areas, primarily heat-retaining sidewalks and paved areas where at the hottest time of the day surface temperatures are reaching 140 degrees Fahrenheit. (See, Declarations of Crystal Sanchez, Herman Barahona, Charles Pfost, Dr. Mayra Pastore).

The circumstances giving rise to Plaintiffs' motion are even more egregious than those that existed during last summer's brutal heat wave. In the year since then, not only has the City enacted the sidewalk ordinance – which it is now falsely using to justify the current sweeps—but it has

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

dramatically expanded areas within City limits defined as "critical infrastructure" where homeless encampments are prohibited.

On October 18, 2022, less than one month after this Court second preliminary injunction ended, the Sacramento City Council approved the City Manager's "Critical Infrastructure" list, which bans people "experiencing homelessness" from camping within 500 feet of "facilities" including City Hall, seven colleges, the Sacramento Convention Center, and 85 K-12 schools, all classified as "gathering centers." Also included, 58 healthcare facilities, 48 light rail stops, 27 bus stops, 22 community centers and three courthouses. The list also includes 650 "air release stations." (See, Sanchez Decl.). The total facilities from which encampments are banned is 1,534. By way of comparison, the federal government's Cybersecurity and Infrastructure Security Agency (CISA) infrastructure list for the City of Sacramento is **9%** of the Sacramento City Infrastructure List.

Adding the restriction against camps "within 500 feet" of such facilities, the percentage of the City of Sacramento from which the homeless are essentially banned is a staggering 41.65% of the of the City's 99.4 square miles. Adding residential parcels, the total proportion of the city in which homeless encampments are completely banned rises to 78.74%, according to a joint study including a map created by the UCLA Center for Healthier Children, Families and Communities in partnership with the Sacramento Homeless Union, Public Advocates and the Sacramento Regional Coalition to Stop Sweeps.  (*Id.*).

Accordingly, for the reasons set forth below and based upon the evidence contained in the numerous declarations filed in support of this motion, Plaintiffs seek an order reinstating, with some modifications, the preliminary injunction that this Court granted and then extended last summer. Plaintiffs urge the Court to use its discretion to regard and treat its previous orders as being in the nature of "the law of the case" and, as such, should govern or at least be persuasive given that there has been no change in the law or the essential factual basis of the prior rulings.

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

Alternatively, bearing in mind the Court's previous admonition to Plaintiffs to "fully comply" when the Court "asks Plaintiffs to adequately make a showing on all the *Winter* elements when seeking a preliminary injunction[,]" the following Memorandum of Points and Authorities sets forth the current facts and legal foundations for what they believe merit the issuance of a new, even stronger Order independent of the Court's prior rulings.

## MEMORANDUM OF POINTS AND AUTHORITIES

19. Pursuant to Local Rule 65.1(a), plaintiffs respectfully move for a Temporary Restraining Order and Preliminary Injunction against Defendants City of Sacramento and County of Sacramento.

20. Plaintiffs also seek an injunction against the ongoing destruction of existing homeless encampments and the "sweeping" of individuals from public spaces by code enforcement and city police who are, in turn, failing to provide immediately accessible indoor alternative accommodations as required under the Ninth Circuit's landmark decision in *Martin v. Boise*. In many cases, pushed out of areas where there is at least a modicum of shade and other types of cover from the sweltering heat, Defendants are placing the unsheltered homeless at a greater risk of harm on the unprotected streets, sidewalks and within "sanctioned" encampments such the City's "Safeground" site where temperatures within city-provided tents placed on heat-absorbing asphalt and fenced away from large, nearby shade-providing trees remain dangerously high.

21. A Temporary Restraining Order is necessary to prevent irreparable harm, as detailed in the nine declarations filed here in support of Plaintiffs' motion, to homeless plaintiffs prior to this Court having an opportunity to make a decision on Plaintiffs' motion for a preliminary and/or permanent injunction. As described in detail in the declaration of this attorney, counsel for plaintiff Sacramento Homeless Union Anthony Prince contacted counsel for the City of Sacramento and Sacramento County, respectively, as he did last summer, to urge an end to the sweeps. However, as of this filing, Defendants have refused to desist from the clearing of encampments where shade

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

provided by trees and other protection from the heat offered at least a modicum of protection. Accordingly, Plaintiffs respectfully requests that the Court grant its motion for relief as set forth in their proposed order, submitted herewith.

## STANDARD OF REVIEW

To determine whether to issue a TRO, the courts in the Ninth Circuit apply the same analysis used to evaluate a motion for preliminary injunction. *McCarthy v. Servis One, Inc.,* 2017 U.S. Dist. LEXIS 32622, at *9–10 (N.D. Cal. Mar. 7, 2017).

In deciding an application for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, courts in the Ninth Circuit look to the following factors: a) The movant has shown a likelihood of success on the merits; b) There is a likelihood that the movant will suffer irreparable harm in absence of a preliminary injunction; c) The balance of equities tips in the movant's favor; d) The injunction is in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

**Plaintiffs Are Likely to Succeed on the Merits; Alternatively, Under the Ninth Circuit's *Alliance For The Wild Rockies v. Cottrell,* Plaintiffs Raise "Serious Questions" of State-Created Danger Going to the Merits**

23.   To determine whether to issue a TRO, the courts in the Ninth Circuit apply the same analysis used to evaluate a motion for preliminary injunction. *McCarthy v. Servis One, Inc.*, 2017 U.S. Dist. LEXIS 32622, at *9–10 (N.D. Cal. Mar. 7, 2017). A party seeking a preliminary injunction in the Ninth Circuit must meet one of two variants of the same standard. First, a party can show that he or she is likely to succeed on the merits, that he or she is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his or her favor, and that an injunction is in the public interest. *Alliance For The Wild Rockies v. Pena,* 865 F.3d 1211, 1217 (9th Cir. 2017).

24.   Alternatively, under the sliding scale variant of the standard, if a plaintiff can only show that there are ***"serious questions going to the merits"***—a lesser showing than likelihood of

success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two factors are satisfied. *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). These two alternatives are at the ends of a single continuum rather than two separate tests. *Immigrant Assistant Project of Los Angeles County Fed'n of Labor v. INS*, 306 F.3d 842, 873 (9th Cir. 2002).

25. Here, Plaintiff raise serious questions including: a) whether by breaking up encampments where a modicum of protection from the heat exists and exiling them to the superheated, unshaded streets and sidewalks or placing persons in tents, away from nearby shade trees, on superheated asphalt in the Miller Park "Safeground" where internal tent temperatures reach and exceed triple-digits, Defendants affirmatively increased the risk of harm in violation of the 14th Amendment right to bodily integrity; b) whether the City is bowing to pressure from the Sacramento Superior Court and the District Attorney and, fearing lawsuits permitted by "Measure O" is escalating sweeps and the clearing of homeless encampments; c) whether the dramatic expansion of what is regarded as "critical infrastructure" can be justified or is, instead, a means to effectively ban homeless persons from areas that provide more natural protection from the intense heat; and d) given the conditions that exist at the Miller Park "Safeground" whether relocating persons from shaded areas to the site is just as much a state-created danger as pushing the unhoused into the streets by breaking up encampments in more protected areas.

26. To sum up, Plaintiffs have met their burden of demonstrating either a "fair chance of success on the merits" or, alternatively and at the least, "questions ***serious enough to require litigation***. *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009) (Emphasis added.)

**The Harm to Plaintiffs is Both Irreparable and Imminent**

27. To support injunctive relief, harm must not only be irreparable, it must be imminent; a threat of irreparable harm in the indefinite future is not enough. Rather, a plaintiff must

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief. *Amylin Pharm., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011).

28. To demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief, a plaintiff must proffer probative evidence that the threatened injury is imminent and irreparable. *Rubin ex rel. NLRB v. Vista Del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1100-01 (C.D. Cal. 2015).

29. Here, as set forth in the supporting declaration of medical science liaison Mayra Pastore, PhD and earlier established by the declaration of public health expert Flojaune Cofer, PhD, MPH, the impact of exposure of unsheltered persons to extreme heat may include irreversible aggravation of underlying medical conditions, permanent damage to vital organs and even death. That these harms are not only imminent but actually occurring in real time is shown by the declarations of Homeless Union President Crystal Sanchez, medical science liaison Mayra B. Pastore, PhD, Environmental Justice advocate Herman Barahona, homeless advocate Charles Pfost and directly impacted displaced homeless Sacramentans Lacey DuBois, Angela Wallace, Lisa Barnes, Vincent Bell and William McGuiness.

30. "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Inland Steel Co. v. United States*, 306 U.S. 153, 156 (1939); *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940). In *Winter v. Natural Resources Defense Council, Inc.* 555 U.S. 7 the Court reiterated the general standard and held that a "mere possibility" of irreparable harm is insufficient to warrant a preliminary injunction. Here, the threatened injury is hardly speculative and far more than a "mere possibility."

Here, Defendant City of Sacramento, itself, has indicated the public interest in insuring protection for the homeless from extreme temperatures. Over three years ago on January 14, 2020, the City Council adopted Resolution No. 2020-0017 which noted at that time "2,800 persons within the city are experiencing unsheltered homelessness." "There is a significant threat to the health and

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

safety of unsheltered persons in the number of people experiencing homelessness," continued the resolution. "These individuals lack adequate sanitary facilities and are at risk from theft, crime, ***and extreme weather conditions***. ***These conditions threaten the physical and mental health and safety of those experiencing homelessness***. (Emphasis added.) See, Declaration of Crystal Sanchez. Three and half years later, Resolution No. 2020-0017 remains in effect as the Summer of 2023 brings with it the "extreme weather condition" of excessive heat, now impacting thousands more of its unhoused residents.

Accordingly, Plaintiffs have met this element of the test for preliminary injunction.

### The Balance of Interim Harms Tips Heavily in Plaintiffs' Favor and the Public Interest is Served by the Granting of Injunctive Relief

31. The court must evaluate the interim harm the defendants are likely to sustain if the injunction is granted and compare it with the harm the plaintiff is likely to suffer if an injunction does not enter. *De Vico v. United States Bank*, 2012 U.S. Dist. LEXIS 155622, at *22 (C.D. Cal. Oct. 29, 2012).

32. The real issue is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002). If a plaintiff can show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then an injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor and the other two *Winter* factors are satisfied. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)

33. In this case, whatever hardship to the City and County may arise in temporarily suspending the enforcement (except in the event of actual, documented, serious and imminent safety and health risks) of its sidewalk, "critical infrastructure" and RV parking regulations etc. is far outweighed by the hardship to those at risk of great bodily harm by unprotected exposure to extreme temperatures.

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

34. The public, which, of course, includes Sacramento's homeless residents, is served by measures that protect its most vulnerable members from harm from extreme weather conditions. Thus, to the extent that the Court's intervention is necessary to insure the most vulnerable members of the community are included, the issuing of an injunction is very much in the public interest. As the Court stated in both of the successive orders for preliminary injunction issued in the summer of 2022, citing to *Cobine v. City of Eureka (Cobine II),* "[C]ourts have found that there is a strong public interest in maintaining the protection afforded by the constitution to those most in need of such protections."

**The Court Should Re-instate Its Orders of July 28, 2022 and September 2, 2022, With Modifications to Address Intensified Homeless Sweeps and the State-created Dangers They Pose in Extreme Heat**

35. Under the law-of-the-case doctrine, courts, at their own discretion, "will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case." *Gonzalez*, 677 F.3d at 389 n.4; see also *United States v. Houser*, 804 F.2d 565, 567 (9th Cir. 1986). The doctrine encourages the conservation of limited judicial resources and promotes consistency by allowing court decisions to govern the same issues in subsequent stages of the same case. See *Am. Civil Liberties Union v. F.C.C.*, 523 F.2d 1344, 1346 (9th Cir. 1975). Exceptions to the law-of-the-case doctrine occur where the prior decision is "clearly erroneous" and enforcing it would create "manifest injustice[.]" *See In Re Rainbow Magazine, Inc.,* 77 F.3d 278, 281 (9th Cir. 1996). See also, *Merritt v. Mackey,* 932 F.2d 1317, 1320 (9th Cir. 1991) (The doctrine is concerned primarily with efficiency and should not be applied when the evidence in subsequent issues are substantially different, when the controlling law has changed, or when applying the doctrine would be unjust.)

36. Of course, under Rule 54(b) a district court has discretion whether to adhere to its own earlier rulings and it is also true that the doctrine is generally less applicable to disposition of motions for temporary restraining orders and preliminary injunctions. Here, however, where the current circumstances are substantively identical -- indeed, even more compelling -- than with last summer's injunctive relief, the application of the "law of the case" is appropriate.

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

37. Moreover, Defendants conceded the validity and soundness of the Court's prior, successive orders by choosing not to appeal or seek a motion for reconsideration or modification of the preliminary injunctions. And, as the Court noted in its previous orders, Defendant failed to produce a single declaration disputing the forecasted extreme temperatures, their impact on those forcibly removed from shaded areas as set forth by the declaration of public health specialist Flojaune Cofer, PhD, MPH and the numerous medical, meteorological and the City's own protocols filed as exhibits thereto.

38. In sum, while it is true that district court orders denying or granting preliminary-injunction requests do not typically become law of the case, here, where there has been no substantive material difference between the circumstances giving rise to the two successive preliminary injunctions granted by this Court last summer and those now present, application of the doctrine is appropriate.

**Conditions at the City's Miller Park "Safeground" Constitute a State-Created Danger**

39. Last summer, although this Court ruled that Plaintiffs had not established that "the City had affirmatively created a danger by failing to open a sufficient number of cooling centers," the Court nonetheless found the conditions described by Plaintiffs at the City's Miller Park "Safeground" to be "shocking" and opined that "it is distressing that the unhoused face such a terrible situation on days with extreme heat." (ECF No. ___).

40. For purposes of the instant motion, based upon the evidence set forth in the accompanying declarations, Plaintiffs assert that the Miller Park "Safeground" is the exact opposite of anything safe and the City's policy of relocating persons to the site to be a state-created danger. As described in their respective declarations, Crystal Sanchez, Herman Barahona and Charles Pfost, while barred from entering the camp, were able to talk to residents at the fence, and former residents, personally observe conditions inside the camp and measure the temperatures on the very same asphalt surfaces that extend beyond the Safeground fences. Not only does the heat-absorbing

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

asphalt increase the temperature within the tents placed directly upon them, but as cited in the Declaration of Herman Barahona, toxic fumes comparable to automobile exhaust, are released into and remain within the tents and on the parking lot as a whole as residents necessarily leave their tents at various times of the day.

**The "Offer" to go to Miller Park "Safeground" is a "Hobson's Choice" That "Can't Be Refused": The Alternative is Eviction Onto Unprotected Streets and The Likelihood of Of Being Swept Yet Again.**

41. Plaintiffs anticipate that Defendants might argue that the "offer" to move those swept from shaded areas into the Miller Park Safeground —which could be, and in some cases, was declined – was a choice made by the unhoused. However the argument is both a red herring and one that was addressed in *Kennedy v. City of Ridgefield:*

> "In examining whether an officer affirmatively places an individual in danger, *a court does not look solely to the agency of the individual nor [should it rest its] opinion on what options may or may not have been available to the individual.* Instead [the court] must examine whether the officer left the person in a situation that was more dangerous than the one in which they found him. *Kennedy v City of Ridgefield,* 439 F.3d 1055,1062 (9th Cir. 2006) (Emphasis added.)

42. Here, what the City of Sacramento "offers" is a cruel "Hobson's choice." Plaintiffs can "choose" to go to Miller Park, and suffer the conditions described in detail in Plaintiffs' numerous supporting declarations, or be forced out of areas where a modicum of protection from the burning sun exists and into the unprotected streets of the City with whatever they can carry and losing everything else—including tarps, covers, tents and other life-saving survival items as happened, for example, in the case of Declarant Vincent Bell.

43. The Supreme Court has universally found such "Hobson's choices" to constitute waivers of constitutional rights "[it is] intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394 (1968). In *Simmons*, the lower court held that the defendant's testimony at a suppression hearing could later be used against him at trial. The Supreme Court reversed, holding that the defendant could not be put

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

to the choice "either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination." Id. In *Garrity v. New Jersey*, 385 U.S. 493 (1967), the Supreme Court found it impermissible to require public employees either to answer questions by criminal investigators, or else lose their jobs. "The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice . . . ." *Id.* at 497. Said the Court: "Where the choice is between the rock and the whirlpool, duress is inherent in deciding to waive one or the other." Id. at 498. And, finally, in *United States v. Jackson*, 390 U.S. 570, 581-82 (1968) -- particularly relevant here, given that "protection from extreme heat could be a matter of life or death" to use the words of this Court in issuing last summer's Orders, -- the Supreme Court held that defendants could not be forced to "choose" between either contesting guilt at trial or avoiding a death penalty charge. *Id*. at 582-83.

**PRAYER FOR RELIEF**

44.  Plaintiffs pray that the Court either re-instate its prior Orders for Preliminary Injunction or issue a new Preliminary Injunction, in either case to be in effect from August 1, 2023 through at least mid-September, 2023, when it is predicted that temperatures will finally fall below and remain below 90 degrees Fahrenheit, the temperature at which the City of Sacramento itself concedes such heat becomes "excessive."

45.  Plaintiffs pray for the issuance of a Temporary Restraining Order given that the earliest hearing date available on their motion for preliminary injunction is August 10, before which temperatures will soar into the triple-digits (See Ex. to Sanchez Decl.) Unless Defendants are immediately enjoined from clearing encampments belonging to the unhoused, Plaintiffs will be at risk for great bodily harm or even death.

46,  Finally, Plaintiffs pray this court enjoin Defendant City of Sacramento from prohibiting Union representatives, advocates and community supporters entry to the Miller Park

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

"Safeground" so that they may assist residents in investigating and alleviating the dangerous conditions therein.

Dated: July 31, 2023                                        Respectfully Submitted,

/s/ *Anthony D. Prince*

Anthony D. Prince,
General Counsel, California Homeless Union
Law Offices of Anthony D. Prince,
Attorneys for Plaintiffs

## VERIFICATION

I, Crystal Rose Sanchez, in my official capacity as President of the Sacramento Homeless Union, lead organizational Plaintiff in the above-captioned action, declare the following:

The facts alleged in this Complaint and *Ex Parte* Application for a Temporary Restraining Order and Preliminary Injunction are true of my own knowledge, except those statements made upon information and belief and, as to such statements, I believe them to be true.

Sworn under penalty of perjury under the laws of the United States of America

Dated: July 31, 2023

Executed at Sacramento, California                 /s/ Crystal Sanchez
                                                                        President, Sacramento Homeless Union

*Plaintiffs' Ex Parte Motion for Preliminary Injunction.*

Page | - 16 -