Anthony D. Prince (SBN # 202892)
General Counsel, California Homeless Union/Statewide Organizing Council
Law Offices of Anthony D. Prince
2425 Prince Street, Ste. 100
Berkeley, CA 94705
Tel: 510-301-1472

Attorneys for Plaintiffs

## UNITED STATES COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SACRAMENTO HOMELESS UNION, a local of the CALIFORNIA HOMELESS UNION/STATEWIDE ORGANIZING COUNCIL, on behalf of itself and those it represents; BETTY RIOS; DONTA WILLIAMS; FALISHA SCOTT and all those similarly situated,<br><br>　　　　　Plaintiffs<br><br>　　vs.<br><br>COUNTY OF SACRAMENTO, a political subdivision of the State of California; CITY OF SACRAMENTO, a municipal corporation; and DOES 1 – 100,<br><br>　　　　　Defendants. | Case No.:  2:22-cv-01095-TLN-KJN<br><br>**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION; SUPPLEMENTAL DECLARATION OF CRYSTAL SANCHEZ.** |

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITON TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**Johnson v. Grants Pass**

"At bottom," Defendants write, "*Johnson v. City of Grants Pass* is an Eighth Amendment case challenging the constitutionality of certain specific ordinances imposing fines on the PEH [People Experiencing Homelessness]. Plaintiffs here are not challenging the constitutionality of any City ordinance[.]" Doc. 43, 10-11.

What Defendants omit is that plaintiffs in *Johnson*, as in the case at bar, made *an as-applied challenge*. That the Eighth Amendment was among the constitutional violations asserted by the

*Plaintiffs Reply Brief*

Page | - 1 -

*Johnson* plaintiffs and became the basis for the Court's decision does not negate the deprivation of the 14th Amendment right to bodily integrity as a question of constitutionality.

Defendants also erroneously assert that *Johnson* does not consider the state-created danger doctrine. Here, while the words "state created danger" may not appear in the decision, Johnson clearly addresses the substance of the matter, i.e., whether the City of Grants Pass affirmatively increased the risk of harm by enforcing ordinances that deprived the homeless of essential, sleep and survival related items of personal property such as bedding. Defendants confuse form and content in an effort to excise critical language in the decision: "In *Johnson v. City of Grants Pass*, 50 F.4th 787, 813 (9th Cir. 2022), the Ninth Circuit recently held that "'sleeping' in the context of *Martin* includes sleeping with rudimentary forms of protection from the elements, and that *Martin* applies to civil citations where . . . civil and criminal punishments are closely intertwined." *Coal. on Homelessness v. City of S.F.*, 22-cv-05502-DMR (N.D. Cal. Dec. 23, 2022)

The conduct on which the 9th Circuit focused in Johnson was on homeless persons "taking necessary minimal measures to deep themselves warm and dry while sleeping," and cited Martin in characterizing Grants Pass restrictions as "enforced against homeless individuals who take "even the most rudimentary precautions to protect themselves from the elements." *Id.* Thus, Johnson explicitly addressed and disapproved heightened risks of harm imposed on the unhoused by the City of Grants Pass by way of an affirmative act of deprivation.

Here, the City and County of Sacramento are depriving homeless persons of the "rudimentary precautions" and preventing them from "engaging in conduct necessary to protect themselves from the elements" by way of seeking shade during a potentially deadly heat wave.

The Court has asked us to address what effect, if any, *Johnson* has on this case. To the above points regarding that Court's discussion of affirmative acts increasing the risk of harm to the unhoused, Plaintiffs draw the Court's attention to the instruction on remand provided by the Ninth Circuit in that case to "narrow the injunction to the anti-camping ordinances and enjoin enforcement

*Plaintiffs Reply Brief*

of those ordinances only against involuntarily homeless person[s] *for engaging in conduct necessary to protect themselves from the elements*[.]" *Id.* (Emphasis added.) Here, where the conduct is remaining in shade and other minimal, but no less significant "rudimentary precautions" to protect themselves from the excessive heat, Plaintiffs urge that the Court either extend the current TRO or issue a preliminary injunction to remain in place until the 90 degree plus weather pattern abates.

Finally, as regards the effect of *Johnson* on the case at bar, as a reaffirmation of the essential holding of *Martin v. Boise*, which, in turn adopted *Jones v. Los Angeles*. As such, and in particular, in this regard Plaintiffs again raise the issue of Miller Park which, in its current form and a currently being operated is not in line with *Martin's* instruction most recently addressed at some length by Judge Morrison England in *Warren v. Chico*, Case No. 2:21-cv-00640 MCE-DMC.

There, the City of Chico moved homeless persons out of the shade afforded along Comanche Creek and onto the asphalt tarmac of an abandoned airport. Judge England first considered the meaning of "shelter" citing to Websters Dictionary and the Cambridge Dictionary, which defines the word as "(a building designed to give) protection from bad weather, danger, or attack." "Under none of these definitions," held the Court, "is the airport site a 'shelter'. It is an asphalt tarmac with no roof and no walls, no water and no electricity. It is an open space with what amounts to a large umbrella for some shade. It affords no real cover or protection to anyone." Finally the Court held," Even *Martin*, which does not directly answer this question, seems to contemplate shelter will offer individuals a place to sleep "indoors." 920 F.3d at 617.

Here, the similarities are striking. The Miller Park "Safeground" sits on asphalt, in direct sun and heat, away from large canopy shade trees in the park, proper. Even the photographs accompanying the declaration of Nick Golling in support of Defendants Opposition show excessive temperatures. And although it appears from one of the videos that someone has attached some kind of tube to the garden hose from which water is being supplied, there is no evidence that what the

*Plaintiffs Reply Brief*

residents are drinking has had the toxins listed in the declaration of Charles Pfost effectively removed by way of the proper valves. In short, in its current state, Miller Park is the opposite of a safe alternative to the City streets and the relocation of the unhoused "voluntarily" or otherwise, constitutes a state-created danger.

### Defendants Misunderstand *Cobine* and *Jeremiah*

Defendants cite to *Cobine v. City of Eureka* to address state created danger. But whereas in Cobine the Court considered "the generalized dangers of living on the street [that] pre-existed plaintiffs' relocation [from the encampment]" here we are dealing with a specific, particularized danger of extreme heat. More important, and more indicative of Defendants' misunderstanding of state created danger doctrine, is that it is irrelevant whether the dangers pre-existed the affirmative acts of the City; it is the disregard of the known risk of removing persons from the shade wherein they had obtained some protection and affirmatively placing them in circumstances more dangerous if they had left them alone. See, *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061-62 (9th Cir. 2006) ("In examining whether [the city] affirmatively places an individual in danger, [the court does] not look solely to the agency of the individual, nor [does the court rest its] opinion on what options may or may not have been available to the individual. Instead, [the court] examine[s] whether [the city] left the person in a situation that was more dangerous than the one in which they found him." *Id* at 1062.

In *Jeremiah*, as Defendants point out, this Court found that even *the potential* confiscation of personal property, including shelters and other items of protection from the weather would knowingly place the unhoused in danger even though, again as Defendants point out, this Court did not actually confiscate the items. In the case at bar, we have the exact opposite situation: as shown in Plaintiffs numerous declarations over the course of this year-long dispute, Defendants *have* as an integral part of the sweeps in most cases, seized, bulldozed and destroyed property belonging to the homeless, who are also forced to abandon items that they simply are physically unable to carry with

*Plaintiffs Reply Brief*

them. The City says 'not to worry,' citing their protocol that requires "the safekeeping of their life necessities, including tents and other protection from the elements, for at least 60 days consistent with California Civil Code Section 2080.10." Doc. No. 43, P.14. This is hardly a comfort to the unhoused, swept person who is at that moment, and in the minutes, hours and days on the streets to follow, actually deprived of what the City itself admits are possessions that could be a matter of life and death. In sum, the City's twisted "understanding" of *Jeremiah* is the exact reverse of what this Court's ruling actually represents.

### Defendant City of Sacramento's Declarations and Evidence

Jan Null:  In his Supplemental Declaration, Mr. Null disputes the reliability of data and forecast of the "TimeDate" online site that accompanies the Declaration of Crystal Sanchez. However, in the declaration he filed last summer in support of the City's Opposition, neither he nor Defendant objected to our found any fault with the "TimeDate" data relied upon by Plaintiffs, which essentially mirrored that which he obtained by way of the official National Weather Service site, "Downtown Sacramento" from NOAA, National Center for Environmental Information. See, Doc.28-3. In fact, Mr. Null confirmed, as he declared, "An analysis of this data shows that in August in Sacramento there are an average of 22.5 days with daily maxima of 90 degrees or greater. It then shows that that in September there are an average of 17.5 days in the same category." *Id.* at Pg.2. In his 2022 declaration, Mr. Null relied upon "daily maximum temperatures for the period of 2,000 through 2021 for Sacramento" which figures as shown in Exhibit 4 to his 2022 declaration "were retrieved and then parsed by month and 5-degree increments." *Id* at 2.

The declarations that Mr. Null now files do not include a repudiation of his earlier statements in which he relied on forecasts based on temperatures recorded in Sacramento that were over a year and a half-old at that time. Accordingly, it would appear there is something else motivating the wholesale derogation of the forecasting process that characterizes this summer's declaration.

*Plaintiffs Reply Brief*

The one part of his current declaration that stands out, and which Plaintiffs do not question is his admission that "Official temperatures ***are taken in shaded well-ventilated locations***, approximately 5 feet above a natural surface." Doc. 43-6 at P.2. (Emphasis Added). In other words, reported temperatures of the highs and lows of a given day *do not reflect* unshaded, poorly ventilated areas where, it logically follows, temperatures are much higher.

**SPD Captain Bryce Heinlein:** As with others of the City's supporting declarations, Captain Heinlein repeats the description of issues allegedly attending homeless encampments, crimes and other problematic incidents allegedly perpetrated by persons who are identified only by the shared characteristic of being unhoused. American history unfortunately is rife with examples wherein the bad conduct of a member of a disfavored population group that shares common traits and circumstances is used as a justification for the condemnation and worse of all members of that group as a class.

What stands out, however, are the "before" and "after" photographs that accompany the Declarations of Captain Heinlein and others that repeatedly show that the encampments which were cleared and the areas from which the unhoused were swept into more dangerous circumstances were, with very few exceptions, protected by large-crowned, sun-blocking shade and shadow. They are the very picture of state-created danger.

**Lewis Halsey:** Professor Halsey's declaration is about people at rest, endurance athletes, the effects of heat on smart-phone users in China and "compensable conditions" that are supposed obviate the risks of extreme heat. His CV, list of published works, etc. is largely about birds and other animals. While animal studies may be a legitimate component of research on the impact of extreme weather on humans, there is not a single mention, reference, published work or anything else in Professor Halsey's declaration of the impact of excessive heat on unhoused persons. Such statements as "Some of my own work provides evidence that the body copes well with high temperatures" (Doc. 43-9, P.2.), unaccompanied by an actual description or data derived from such

*Plaintiffs Reply Brief*

Page | - 6 -

"work," typify Halsey's dismissive disregard of medical science and substantially fails to counter Plaintiffs evidence.

**Benjamin Worral:** This declarant attempts to show that this Court's prior heat-related injunctions of 2022 were the cause of what he asserts were increased calls and self-referrals seeking help. It does not occur to Mr. Worral that the number of unhoused in Sacramento County has increased by thousands. In considering the alleged increase in calls in calls in the the two months immediately following last summer's injunctions he makes no attempt to categorize or identify the nature of the help that was sought which may have been about matters unrelated to excessive heat. The point of the previous injunctions was not and could not be to end all suffering, heat related or otherwise, but to stop the City from making matters worse by affirmatively throwing the unhoused out of shaded areas into more dangerous circumstances of exposure. The suffering that results from homelessness is not now before this Court: what is before the Court is the City's affirmative conduct of increasing a specific risk.

**Nick Golling:** As detailed in the declarations of Herman Barahona, Crystal Sanchez and Charles Pfost, representatives of the Homeless Union and other community groups were prevented from entering the Miller Park "Safeground" even when they were invited in, to talk to residents, to ask questions, to investigate. Nevertheless, overall, the photographs accompanying his declaration, including excessive temperatures, etc. are generally corroborative of Plaintiffs' evidence.

**Michael Dobyns:** In her Supplemental Declaration, Crystal Sanchez addresses the issue of critical infrastructure. Even assuming errors in the data depicted in the map and other materials developed by the UCLA researchers attached to Ms. Sanchez' earlier Declaration, Mr. Dobyn's declaration shows that a substantial percentage of the City is off-limits to homeless persons, does not provide any data showing that, standing alone, the presence of homeless encampments poses a risk of vandalism of or interference with critical maintenance, any more than the risk posed by a non-homeless person or group of persons. The City continues to distort the rationale behind the

*Plaintiffs Reply Brief*

federal and local critical infrastructure policies, which arose from and are in place primarily to prevent acts of political terror.

## Sacramento County's Opposition

Plaintiffs concede that additional evidence regarding the County's conduct re sweeps is, beyond that previously provided in this litigation, is at this stage, minimal. Nevertheless, Defendant does not and cannot deny that it is conducting similar displacements to those conducted by the City. Attached hereto as an Exhibit to the Supplemental Declaration of Crystal Sanchez is a true and correct copy of a County Notice to Vacate that was posted on June 22, 2023 in the American River Parkway County Regional Park by Dept. of Regional Parks, Park Ranger Unit. The notice was posted in a shaded area of the Park at a homeless encampment on June 20, 2023 and, according to Ms. Sanchez' declaration, is typical of the Notices and resulting removal of the unhoused from the well-shaded public parks and ejectment into County sidewalks and streets, including during periods of excessive heat.

The increased risks of harm to the displaced created thereby are the same as those created by the City sweeps and are not speculative. Also, as the Court will be made aware by the parties' Joint Statement, the County is at the table and has indicated its interest in the possibility of an Agreement of some sort. Accordingly, Plaintiffs urge the Court to act prophylactically to avoid harm and, in light of the County's involvement in the current discussions, to better facilitate that process, extend the reach of the injunction to include Sacramento County.

Dated: August 9, 2023   Respectfully Submitted,

/s/ Anthony D. Prince

Law Offices of Anthony D. Prince
Attorney for Plaintiffs

*Plaintiffs Reply Brief*

Page | - 8 -