Anthony D. Prince (SBN # 202892)
General Counsel, California Homeless Union/Statewide Organizing Council
Law Offices of Anthony D. Prince
2425 Prince Street, Ste. 100
Berkeley, CA 94705
Tel: 510-301-1472

Attorneys for Plaintiffs

## UNITED STATES COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SACRAMENTO HOMELESS UNION, a local of the CALIFORNIA HOMELESS UNION/STATEWIDE ORGANIZING COUNCIL, on behalf of itself and those it represents; BETTY RIOS; DONTA WILLIAMS; FALISHA SCOTT and all those similarly situated,<br><br>           Plaintiffs<br><br>     vs.<br><br>COUNTY OF SACRAMENTO, a political subdivision of the State of California; CITY OF SACRAMENTO, a municipal corporation; and DOES 1 – 100,<br><br>           Defendants. | Case No.: 2:22-cv-01095-TLN-KJN<br><br>**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO ORDER TO SHOW CAUSE WHY THE CITY OF SACRAMENTO SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATION OF TEMPORARY RESTRAINING ORDER; DECLARATION OF CRYSTAL SANCHEZ; DECLARATION OF JEREMIAH HANCE; DECLARATION OF ANTHONY D. PRINCE** |

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITON TO ORDER TO SHOW CAUSE WHY CITY OF SACRAMENTO SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATION OF TEMPORARY RESTRAINING ORDER**

**The City Fails to Show that It Was Unable to Comply as Required Under *FTC v. Affordable Media***

Defendant relies on *F.T.C. v. Affordable Media,* for the proposition that the party moving for contempt must show by clear and convincing evidence that the contemnors violated a specific and definite order of the Court. However, *F.T.C.* goes on to hold that once the moving party has made the required showing, "the burden then shifts to the contemnors to demonstrate that they were *unable* to comply." *F.TC.* at 1239.

*Plaintiffs Reply Brief*

Here, the Court's August 3, 2023 TRO expressly and unambiguously enjoined "the City and all of its officers, agents, servants, employees, attorneys and all persons under their direction and control, from clearing encampments belonging to the unhoused." (ECF No. 39.) As with its prior, consecutively issued TROs during the extreme heat of 2022 -- which considered and rejected any exceptions, specifically, one that would have permitted the City to enforce its "critical infrastructure" ordinance -- the August 3, 2023 Order provided for no exceptions. Plaintiffs contend that a more specific and definite order would be hard to imagine. Accordingly, the burden now shifts to the City to demonstrate the impossibility of compliance. Yet, nowhere in its Opposition does Defendant actually explain exactly how it was affirmatively prevented from complying with the TRO.

This Court issued the August 3, 2023 TRO and the parties were so notified at 8:43 am that morning. Yet it was not until 12:21 pm, almost four hours later, that Assistant City Manager Mario Lara, per his own declaration, "sent a text message" allegedly directing "lead contacts" in the Fire, Police, Community Response, Code Compliance and Park Ranger departments "responsible for addressing homeless encampments" to "refrain from moving encampments." (ECF No. 58). Notably, the text message, itself, is not included as an exhibit to the Assistant Manager's declaration. In fact, Mr. Lara's declaration does not include as exhibits any of the text messages or emails that he claims he sent to ensure compliance with the TRO.

The City admits that at 7:00 am, on August 4, almost 24 hours after it was issued, "word of the Order had not been received by police assigned to the downtown corridor" and, therefore, "proceeded with business as usual." The City argues that because it has "5,000" employees, in 18 departments and "hundreds of contracts with third party contractors" this Court's "vague and ambiguous" Order "create[d] chaos and confusion." ECF No. 58 P. 4. However, the City fails to explain exactly how the size of its workforce and the number of contractors it employs *actually prevented rapid communication* of the Order. That rapid communication was possible is suggested

*Plaintiffs Reply Brief*

by the City's own supporting declarants, at least when it comes to departments with arguably less urgent responsibilities.

For example, according to the declaration of Jose Mendez, in 2022 the City received 51,345 complaints of code violations, an average of 140 complaints *per day*, of which 8,249 cases were *actually investigated*, an average of 22.6 investigations per day. Assuming the vast majority of these complaints were handled during a five-day work week, the number of complaints received increase to an average 196 complaints per day and the number actually investigated increases to 31.6 per day. Obviously, such a stellar response record could not be established without an efficient communications system. Yet, the City would have us believe that communications to its police officers and firefighters, which one would assume take an even higher priority than code enforcement and would be carried out even more efficiently and rapidly, were nonetheless "thrown into nothing short of chaos" by this Court's straightforward Order, which the City describes as "overly broad" and "sweeping".

In any event, the City's opposition fails to show any *actual nexus* between the content of the August 3 TRO and its admitted failure to communicate the Order to a discrete and limited number of City employees, i.e., police officers assigned to the downtown corridor and to a single contractor, assigned to City Hall, itself: the Allied Security Company.

At the same time that the City complains of the communications difficulties that supposedly go with the size of its workforce, the number of its departments and its army of contractors, Defendant nevertheless posits that "[p]laintiffs, in fact, have not alleged any violations of the TRO occurring anywhere else within the City aside from City Hall." ECF No. 58 at P.2.

In other words, at least to the extent that the Union might have found out otherwise, there was city-wide compliance with the TRO, suggesting that "business as usual, i.e., clearing of homeless encampments, had been halted which could only have happened if the Order *had been* effectively and broadly communicated. Without coming right out and formally asserting it, the City

*Plaintiffs Reply Brief*

Page | - 3 -

essentially argues the affirmative defense of impossibility when it claims that the Court order "thr[ew] the City into nothing short of chaos to communicate, advise, and ensure that dissemination of an overly broad, sweeping order such as the one issued in this case [was] adhered to." (ECF No. 58.)

The City cannot have it both ways. It cannot blame the City Hall violations on the "chaos and confusion" caused by the Order; it cannot point to "the size and the complexity of the City organization working in real-time to communicate and apply the Court's TRO" and at the same time suggest that the Order was in fact being obeyed as evidenced by the lack of alleged violations "anywhere else" but City Hall.

**City Ignored Plaintiff's Suggestions and failed to "correct" the Contemptuous Act**

In her Declaration, City Attorney Grace Pak acknowledges receiving on the same day as the first violation, Mr. Prince's request that the City post a notice "that campers are entitled to remain at [City Hall] 24 hours a day until the current TRO expires or longer should the court extend its Order." Exhibit D to Pak Declaration, ECF No. 58-2. After the second violation on August 7, 2023, Ms. Pak acknowledges that Mr. Prince sent an email at 10:37 am insisting that "[the]City go to Cesar Chavez Park immediately and otherwise make all efforts immediately to notify those who were displaced this morning that they may return now to City Hall Plaza." Exh. G to Pak Decl. ECF No. 58-2.

The City argues that on both August 4 and August 7 it took "necessary steps" to ensure that police and its City Hall contractor (Allied Security) were "advised" of the TRO.  But by ignoring and refusing to adopt the suggestions from the Union on how to repair the damage already done. Indeed, as Plaintiffs have now discovered and as discussed more fully below, the City not only refused to make efforts to facilitate the return of the evicted campers, but instead placed signs prohibiting daytime camping at both entrances to City Hall – signs that had been displayed pursuant

*Plaintiffs Reply Brief*

Page | - 4 -

to the "Sit-Lie" ordinance for which the TRO provided no exception. Does this sound like the "every reasonable effort" the City says in its Opposition it made to comply with the Order?

Model Civil Jury Instruction 17.1 which appears at the website of the Ninth Circuit Court of Appeals recites: "When a party has the burden of proving any claim or defense by clear and convincing evidence, it means that the party must present evidence that leaves you with *a firm belief or conviction that it is highly probable that* **the factual contentions of the claim** *or defense are true.*" (Emphasis added.) See *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (defining clear and convincing evidence). See also *Sophanthavong v. Palmateer*, 378 F.3d 859, 866 (9th Cir.2004) (citing *Colorado*).

Here, it is undisputed that on August 4, less than 24 hours after the issuance of the TRO, and then again on August 7, the City, through its employees, agents and persons under their control, cleared the City Hall Plaza encampment. Plaintiffs have asserted and provided clear and convincing evidence that the City has conceded is true.

In sum, we return to *F.T.C. v. Affordable Media* in which the court held: "[T]he party asserting the impossibility defense must show categorically and in detail why he is unable to comply.*"Id.;* See also Rylander, 460 U.S. at 757 ("It is settled, however, that in raising this defense, the defendant has a burden of production.")  Here, the City has not shown "categorically" and "in detail" why it was unable to comply with the August 3 Order. Accordingly, the Court should find Defendant in contempt of court, impose the sanctions sought by Plaintiffs and issue additional and appropriate orders to ensure the City's compliance with the current injunction and all other relief the Court may order going forward.

**City Shoehorns and Bootstraps Meritless Objections to the TRO, Itself, That It Did Not Raise in Its Opposition to Plaintiffs' Original Motion for Injunctive Relief**

In what is supposed to be its Opposition to the Order to Show Cause, Defendant raises, for the first time, what might be called "substantive" objections to Plaintiffs' original *Ex Parte* Motion

*Plaintiffs Reply Brief*

for TRO that gave rise to this Courts Order of August 3, 2023. Although the scope of the TRO tracks closely to the relief sought by Plaintiffs—i.e., suspension of homeless sweeps, nowhere in its Opposition to Plaintiffs' original motion did the City complain that such relief would be "overbroad" or that it would "give PEH [People Experiencing Homelessness] quasi-public rights to public spaces" and render it impossible to abate public nuisances.

As with yet another new objection to the original order, to wit that it allegedly "creates differing standards based on housing status" the City's attempt to divert the Court's attention from the issue at hand, i.e., did the City without legal justification violate the TRO, should be rejected.

**Good Faith, Substantial Compliance and Purging of Contempt: None of these defenses applies to the City**

The cases relied upon by the City to show "good faith," "substantial compliance" and its entitlement to deserve "purging of contempt" for actions taken subsequent to the violations of the TRO are largely unavailing and actually support Plaintiffs.

For example, *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019) addressed when a court may hold a creditor in civil contempt for attempting to collect a debt that a discharge order has immunized from collection. In that case, the Supreme Court reversed the Ninth Circuit which had concluded that a "creditor's good faith belief" that the discharge order "does not apply to the creditor's claim precludes a finding of contempt, even if the creditor's belief is unreasonable." "But," wrote Justice Breyer "this standard is inconsistent with traditional civil contempt principles, under which parties cannot be insulated from a finding of civil contempt based on their subjective good faith." "This standard is generally an *objective* one," Breyer continues, "We have explained before that a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable. As we said in *McComb* v. *Jacksonville Paper Co.*, 336 U. S. 187 (1949), "[t]he absence of willfulness does not relieve from civil contempt." *Id.*, at 191.

*Plaintiffs Reply Brief*

Here, to the extent that the City of Sacramento asserts subjectively that it "tried" to comply with the TRO and did not intend to deliberately disobey, "the absence of willfulness does not relieve from civil contempt." *Id.*

Moreover and relevant here as discussed more fully below, the *Taggart* court also held "that subjective intent is always irrelevant. Our cases suggest, for example, that civil contempt sanctions may be warranted when a party acts in bad faith. See *Chambers* v. *NASCO, Inc.*, 501 U. S. 32, 50 (1991). Thus, in *McComb*, we explained that a party's "record of continuing and persistent violations" and "persistent contumacy" justified placing "the burden of any uncertainty in the decree . . . on [the] shoulders" of the party who violated the court order. 336 U. S., at 192–193.

As discussed more fully below, evidence of violations of the current, extended Order of August 16, 2023 indicates just such continuing and persistent violations.

**No Substantial Compliance**

Defendants rely on *N.L.R.B. v. A-Plus Roofing, Inc.*, 39 F.3d 1410, 1418 (9th Cir. 1994) to claim that substantial compliance purges civil contempt. In that case, the Ninth Circuit upheld civil contempt recommendations by a magistrate judge because the Defendants had produced many, but not all, of the documents they had been ordered to produce during discovery. Even though the defendants obeyed much of the discovery request, the amount of compliance did not constitute *substantial* compliance. If anything, *N.L.R.B.* shows that substantial compliance is a high bar that does not permit defendants to indulge themselves by violating specific portions of a court order.

In *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.* a case involving a consent agreement arising from a copyright infringement and misleading advertising claim. The Court held that there was an insufficient showing to justify contempt since there were ambiguities in the consent agreement. Here, as discussed above and in contradistinction to the facts in Vertex, there is no

ambiguity in this Court's order of August 3 and, in fact, none is *shown* by Defendants despite their characterization of the TRO as "vague" and "overbroad."

As to the August 8, 2023 power washing of City Hall Plaza, Counsel objects that TV reporter Monica Coleman's report is hearsay. However, it is well-settled that for purposes of considering preliminary injunctions, "at the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence"); cf. Moore's Fed. Prac. Civ. § 65.23[2] *Sierra Club, Lone Star Chap. V. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993). In any event, Ms. Pak acknowledges receipt of Plaintiffs' counsel's email at 9:33 am. She Could have looked out the window to see that the Campers were not there almost three hours after the power washing had taken place.  Plaintiffs demanded an explanation and received none, although they dispute the one explanation provided by news reporter and eyewitness Monica Coleman but no evidence of a demand for retraction or correction of Ms. Coleman's report has been produced.

**City Hall: The Contumacious City Hall Sweeps Have Driven the Unhoused Away and Deterred them from seeking relief from the heat at that location.**

In its Opposition, the City sets forth the chronology of measures it has taken for over a decade to keep unhoused persons out of City Hall Plaza. What the City leaves out of this history is the widespread opposition to these measures from broad segments of the community. See, Declaration of Crystal Sanchez. The City admits the political significance of this location, writing in its Opposition, "The City Hall facility, and specifically the Plaza are often the site of public protests and demonstrations on issues of local, regional, state and national affairs."

As described in the accompanying declaration and exhibits thereto of Crystal Sanchez, the City is violating the Court's Order of August 16, 2023 extending and modifying the August 3, 2023 TRO by placing signs at City Hall warning homeless persons from sitting, lying or having property at City Hall. These are the very same signs that have been displayed for years as the City enforced

*Plaintiffs Reply Brief*

the City Hall "sit/lie" prohibition. As soon as the Union became aware of this situation, Plaintiffs' counsel notified the City and demanded that the signs be removed. The City has refused to do so, instead, by way of email messages from City Attorney Grace Pak, it has defended the display of the signs. (See, Exhibit C to Declaration of Anthony Prince).

The City's argument is patently disingenuous and only compounds and provides evidence of their determination to keep the homeless away from City Hall during the extreme heat days. The signs and the City's response to Plaintiffs' insistence that they be removed during the pendency of the injunction strongly suggest that the prior violations at issue in the Order to Show Cause may have been deliberate and intentional.

Ms. Pak's tortured interpretation of the sign, as set forth in her email of August 24, 2023, is that it only prohibits *the establishment* of encampments when neither the wording of the sign itself or any reasonable reading of it makes any distinction between persons who may set up a "new" camp and those who are already there—or would be if the City had not previously ejected them—and those who whether they were there or not have a right under the Order to remain and not be removed as under the City's own definition, they constitute an encampment. In addition, even under the City's convoluted analysis, the warning on the sign would prevent a person who was removed from City Hall on August 4 or August 7 from returning inasmuch as that person's return would constitute the "establishment" of a new encampment. In other words, the City now gets to enjoy the fruits of its prior violations in the perverse exclusion of the people whose rights the City disregarded in the first place!

Attorney Pak scolds Plaintiffs' counsel: "You have not answered my question—where in the Court's 8/16/23 order does it prohibit signage?" Based on that twisted logic, a police officer could issue a verbal command to a returning, former pre-violation City Hall camper to leave and not violate the current injunction because the Order does not specifically prohibit spoken words.

*Plaintiffs Reply Brief*

Page | - 9 -

Such sophistry, such crass parsing of a clear Order so as to evade its essential command is beneath the dignity of officers of the Court. No exception for the City Hall "sit/lie" ordinance was provided in either the August 3 TRO or the injunction issued on August 16. To now display signs that recite the prohibition codified in the sit/lie ordinance, albeit without actually citing to the Ordinance, must be regarded not only as contempt, but a signal that absent more stringent orders and the imposition of sanctions, the City will continue to defy the Court and place the homeless at increased risk of harm.

**Miller Park**

As set forth in the declarations and supporting exhibits of Plaintiffs' counsel and Union President Sanchez, the tour of Miller Park, during which the City refused to permit the Union representatives to talk with residents, nevertheless revealed serious and ongoing risks to the lives and safety of its homeless occupants including site including, but not limited to electrical wires in standing water; use of a garden hose which Safeground employees admitted is used to fill water jugs; extension cords plugged into other extension cords in water and unprotected from being stepped on and damaged; locked gates where porta potties are located and which are only opened when the porta-potties are serviced and can only be opened by staff, as we were informed; frayed wiring with missing insulation.

In addition, almost two weeks after informing the Court it would do so, the City has failed to provide improved, canvas tents and/or canopies over the existing tents which continue to sit in direct sunlight on asphalt reaching temperatures of 120 degrees F. and greater. Plaintiff's contention that the Miller Park site is anything but a "safe ground" has been borne out by what Plaintiffs observed and were told during the tour. Accordingly, Plaintiffs urge the Court to Order the immediate relocation of Miller Park residents to safe, indoor accommodations by way of hotel vouchers or other accommodations for the duration of any injunction that may be extended into

*Plaintiffs Reply Brief*

Page | - 10 -

September when—as Plaintiffs will show in the Motion for Extension that they will file early next week—the forecast calls for at least 25 days of temperatures in excess of 90 degrees Fahrenheit.

**CONCLUSION**

For the reasons set forth above and in Plaintiffs Motion for an Order for Cause as well as the entire record of this case, Plaintiffs prays the Court will find the City of Sacramento in contempt of court and award sanctions as requested as well as consider additional sanctions in light of Defendant's violations of the Court's Order of August 16, 2023 and additional orders to ensure compliance with whatever extended injunctive relief the Court may order going forward.

Page | - 11 -

Dated: August 26, 2023                                   Respectfully Submitted,

                                                         /s/ Anthony D. Prince

                                                         Law Offices of Anthony D. Prince
                                                         Attorney for Plaintiffs

*Plaintiffs Reply Brief*